[Civ. No. 16484.  First Dist., Div. Two.  Feb. 29, 1956.]

WELLS FARGO BANK AND UNION TRUST COMPANY, as Special Administrator, etc., Respondent, v. H. J. "JACK" DOWD et al., Appellants.

MacInnis, Alaga & Glassman and James Martin MacInnis for Appellants.

Ruth Cessna and Leslie Lubliner for Respondent.

KAUFMAN, J.—This is an appeal from a judgment of the Superior Court in and for the County of San Francisco, in favor of plaintiffs and respondents in an action brought against a real estate broker and the other defendants as his agents, to recover certain real and personal property, and monies, allegedly received by them through fraudulent transactions. Elizabeth Petzold, the original plaintiff, died shortly after the judgment was entered and Wells Fargo Bank and Union Trust Company, as special administrator of her estate, was substituted as plaintiff. Judgment was rendered against appellant H. J. Dowd in the sum of $223,602.02; against his wife Dorothy Taylor Dowd for $201,799.49; against Dowd's sister Harriet Bradford, for $149,014.08; and against Joseph Dowd and Lauretta Dowd, his wife, each in the sum of $145,-018.08. It was ordered that any and all payments made by any defendants be credited against the total judgment in favor of each of the other defendants. The property in the hands of the receiver was declared the property of plaintiff, and the defendants were to be given credit on the judgment to the extent of the actual value of said property.

The first amended complaint herein alleged that at all times mentioned therein, H. J. Dowd was a real estate broker acting in the capacity of broker, agent and fiduciary of plaintiff, Elizabeth Petzold, that Dorothy Taylor was associated with him and acted as his agent, and that J. M. Dowd, Lauretta Dowd and Harriet Bradford were relatives of H. J. Dowd and were acting as his agents. It was alleged that plaintiff owned real property of the approximate value of $150,000, and deeds of trust of an approximate face value of $150,000, that she was of great age, and during the period of 1946-1952 particularly, when she was hospitalized for long periods and unable to conduct her own affairs, she relied exclusively upon H. J. Dowd, for the management and control of her properties and finances. Such reliance was alleged to have been induced by his representations that he was able and experienced in real estate matters and would do only those things which would benefit her holdings. In September, 1952, an investigation of plaintiff's accounts revealed that she then owned but one parcel of real property of an approximate value of $7,500, no deeds of trust, and a total of $15,118.43 cash in bank deposits. The complaint charged Dowd with selling parcels of her realty on his own account secretly through the use of fictitious names or "dummies," to her damage in the sum of $100,000; that he transferred all her

deeds of trust secretly to his own account and those of his agents, and failed to pay over the monies received, except in the amount of $9,500, resulting in a loss of approximately $175,000. Rents and payments on deeds of trust which he failed to pay over to plaintiff were alleged to amount to the sum of $50,000. The complaint recited that upon a prior contested hearing a receiver had been appointed, who had in his hands deeds of trust of the approximate value of $60,000 together with $25,000 cash.

Elizabeth Petzold was at the time of trial, approximately 89 years of age. She had, through dealings in second mortgages, accumulated a considerable fortune, which in 1946, was estimated to have been of a value of approximately $235,000. Her most recent husband was Julian Sanchez, a real estate salesman, some 40 to 45 years her junior, whom she had married on April 25, 1951. They were still married at the time of trial, but were separated for some time prior thereto. Sanchez, a witness at the trial, had been in partnership with H. J. Dowd in the Acme Realty Company, established in San Francisco in August of 1950. Dowd and Sanchez each had a 45 per cent share of the profits, while Dorothy Taylor, a real estate broker, who appears later herein as Mrs. H. J. Dowd, received the remaining 10 per cent. In 1950 Mrs. Petzold was confined to San Francisco Hospital with a broken hip for several months. Defendant's witness Sanchez stated that she was registered there as Elizabeth Seegos, Seegos being the name of a predeceased husband.

Until about five years prior to this action, Mrs. Petzold dealt with four real estate brokers, one of whom was H. J. Dowd. Each of these brokers, including Dowd, had never known her to sell a mortgage note or deed of trust prior to the transactions herein involved. Each of these brokers, with the exception of Dowd, had ceased doing business with her before January 1, 1951. Dowd had prepared Mrs. Petzold's income tax returns for the years 1945 to 1951 inclusive. Mrs. Petzold's husband, Sanchez, testified that he had never had any business dealings with his wife, had never discussed any business transactions with her. She had not discussed with him the matter of getting rid of all her properties in August of 1951 and he claimed to know nothing of an agreement made on August 16 of that year by which Mrs. Petzold disposed of practically all of her property. They were still living together at that time.

The trial of the action was by the court without a jury.

The largest single transaction was the purported purchase on August 16, 1951, of approximately 78 of Mrs. Petzold's notes secured by deeds of trust and an equity in a piece of real property. By this agreement Elizabeth Petzold was supposed to have transferred her second mortgage accounts, with a face value of approximately $107,000 for a consideration of $34,500. Some days prior to the agreement of August 16, 1951, H. J. Dowd and Dorothy Taylor arranged with the San Francisco Bank, Mission and 21st Street Branch, to take over Elizabeth Petzold's notes for collection which were then being collected by Dowd's office. The bank agreed to take them, and Dowd and Miss Taylor were given signature cards to be signed by Mrs. Petzold and returned to the bank. Later, H. J. Dowd drove Mrs. Petzold to the bank, and she remained in the car. Dowd returned the signed cards to the bank. He and William Bloom, an officer of the bank who knew Mrs. Petzold, then came out to the automobile. Bloom advised her that there would be a charge of $1.00 for setting up each collection card, and a 25 cent charge for each monthly payment collected. She protested that she would not pay the collection charge, and Dowd said, ''Don't worry, it has all been taken care of.'' The banker did not see her sign any of the cards, and did not ask her if she had signed them. Handwriting experts testified that the purported signature on each of these cards was simulated, and was not the signature of Elizabeth Petzold. On August 13, 1951, a letter was addressed to Herbert Eling, a broker who still had five or six of her notes in his office, to turn them over to her, that she was placing them with the bank for collection. Her signature on this letter was also characterized as a forgery by the experts.

On August 17, 1951, Dorothy Taylor presented a purported authorization to the bank directing it to turn over all of the Petzold collection accounts to H. J. Dowd and Dorothy Taylor. The plaintiff's handwriting experts characterized Elizabeth Petzold's signature on this letter as a forgery.

On August 16, 1951, a contract was purportedly executed between appellant Harriet Bradford, sister of H. J. Dowd and Elizabeth Petzold under the terms of which Mrs. Bradford was to purchase all of the notes stipulated to have a face value of $107,000 for $34,500. Mrs. Bradford admitted that she had no interest in the transaction, and was a dummy for H. J. Dowd and Dorothy Taylor. The deeds of trust securing the notes were assigned to Mrs. Bradford and re-

corded. The handwriting experts for respondent testified that the signatures of Elizabeth Petzold on the contract and the assignments were all forgeries. The trial court found, and this finding was not objected to, that respondent did not execute the purported contract nor any of the assignments, nor did she have knowledge thereof.

On August 17, 1951, H. Bradford executed a contract providing for a sale of all the notes involved in the prior purported contract for $34,000. It provided for payment of $25,000 in cash, the balance of $9,500 to be paid in 60 days. Both Mrs. Bradford and Dowd admitted that this was a sham agreement. A check for $25,000 was made out by Dorothy Taylor to the order of Elizabeth Petzold, but was never negotiated. Mrs. Petzold's endorsement was found by respondent's handwriting expert Morrill to be a forgery. Miss Taylor explained that she held the $25,000 check as a receipt. Some days later she drew two checks of $12,500 each, to a Betty Wald. Respondent denied having received the checks or having endorsed the name of Betty Wald thereon.

Shortly thereafter, H. J. Dowd opened two accounts, one in the California Savings and Loan Company and another in the Citizens Federal Savings Association. These accounts were in the names of Betty Wald and H. L. Ford in joint tenancy with right of survivorship. H. J. Dowd admitted that he was H. L. Ford, and the bank's representatives testified that the passbooks were mailed to 1224 16th Avenue, San Francisco, the address of Dorothy Taylor. These bank employees had never seen Elizabeth Petzold nor a Betty Wald, nor had they been advised that Elizabeth Petzold was the owner of the accounts.

Appellant J. M. Dowd testified that he had purchased $20,000 worth of notes for $10,000 and that the $10,000 was in the form of currency and cashier's checks which he kept hidden in a cupboard behind the stove in the kitchen of his home. The income tax report of J. M. Dowd and his wife, Loretta, also an appellant herein, shows that he listed on said return the income from all of the notes involved in the August 16th contract as their income.

There was listed in addition to the notes on the appendix to the purported agreement of August 16, 1951, the equity in real property at 503 Alvarado Street, Brisbane, California. The value of this property was stipulated to be $3,996.

The trial court found that respondent did not execute the uniform agreement of sale of August 16, 1951, covering

the notes which were set forth in schedule A of the findings; that she did not execute or acknowledge the signatures on the assignment covering said notes and deeds of trust set forth in that schedule; that appellants and each of them without respondent's knowledge or consent, conveyed these notes and deeds of trust to themselves and converted them to their own use, and that the actual value thereof was $145,018.08, and that the actual value of the equity in 503 Alvarado Street, Brisbane, found to have been converted by H. Bradford, H. J. Dowd and Dorothy Taylor, was $3,996.

On November 29, 1950, appellants H. J. Dowd and Dorothy Taylor, acting under the name of Acme Realty Company, purportedly made an agreement with Mrs. Petzold for the exchange of six notes secured by deeds of trust for five notes similarly secured, purportedly owned by said realty company. These six notes obtained by appellants were sold within a few months for their face value. Mrs. Petzold received notes in exchange of a face value of $10,142.40, on which she received but $74.90 in principal and $183 in interest up to the time of the transaction of August 16, 1951, when all her notes were acquired by appellants. Handwriting expert Conway found Elizabeth Petzold's signature to this agreement had been forged. The trial court found that respondent did not execute the agreement and that her loss therefrom was $8,295.45.

It was also found from a review of the dealings of the parties from 1946 to 1952, that H. J. Dowd and Dorothy Taylor collected sums of money for respondent's account which were not turned over to her, in a total amount of $7,379.76.

In 1946, H. J. Dowd, while acting as agent and broker for Mrs. Petzold, negotiated the sale of her apartment house at 1337 Myrtle Street, Oakland, which respondent had bought in 1920 for $20,000, to a Joseph Risher for the sum of $14,000. Risher was a real estate salesman then in Dowd's employ. Dowd was to receive a commission of $500 for the transaction. He held the property for about 18 months, spent substantial sums on it for improvements and sold it for $25,000. The purchaser gave back a second deed of trust for about $8,000 which Dowd sold to Mrs. Petzold for $7,470.22. Dowd collected the rents from the property during the period which he held it. The court found that Dowd had purchased the property without the consent of respondent for his own account, and had realized a secret profit in the sum of $21,802.53.

In September, 1950, Mrs. Petzold had purchased a piece of real property at 38 Ellert Street, San Francisco, from the Acme Realty Company for $6,500, making a cash payment of $900. Dowd negotiated a loan for her, and respondent assumed an existing loan of $1,800. H. J. Dowd then sold the property, acting as broker, to Keohane, for the sum of $7,950. H. J. Dowd and Dorothy Taylor retained the profit on the transaction, and respondent received a note secured by third deed of trust for $1,000. The court found that appellants H. J. Dowd and Dorothy Taylor had made a secret profit on this transaction of $1,162.50.

Mrs. Petzold owned two notes of the value of $3,253 and $1,397 secured by deeds of trust on real property at 50 B Manchester Street, San Francisco. These were purportedly assigned to Patricia Anstey, sister of Dorothy Taylor. H. J. Dowd and Dorothy Taylor used the name Anstey as an alias. They exchanged for respondent's notes a note purportedly executed by Elizabeth Curtin, another alias used by these appellants. Nothing was paid on the Curtin note, and respondent's two notes were sold by appellants. The trial court found that respondent had not acknowledged or delivered these assignments of May 14, 1951, and that said appellants on that date without the knowledge or consent of respondent, conveyed to themselves and converted to their own use said notes and deeds of trust of the value of $4,069.75.

Finally, it was found that from August 1, 1949, to and including August, 1951, there were numerous unauthorized withdrawals from respondent's savings account in the American Trust Company, 22d and Mission Street Branch, and the San Francisco Bank, 21st and Mission Street Branch. These withdrawals were accomplished through withdrawal slips bearing the forged signature of Elizabeth Petzold. A cashier's check in each amount had been drawn to the order of Elizabeth Petzold. There was testimony that her endorsement on each cashier's check was found to have been forged. The exact amount of these withdrawals was found to have been deposited by Dorothy Taylor in her own account. These withdrawals amounted to the sum of $20,036.35.

The trial court found that respondent was entitled to the return of the specific property described in paragraphs XIII, XIV, XV and XIX of the findings, and that whatever property should be so returned, would be credited at its face value as of June 15, 1953, against the judgment. The above para-

graphs of the findings relate to the major transaction of August 16, 1951, the exchange of notes on November 29, 1950, and the unauthorized assignment of the notes and deeds of trust on the Manchester Street property, all discussed above. It was further found that H. J. Dowd and Dorothy Taylor had not made a secret profit on a transaction concerned with property at 130 Lakeview Street, San Francsico; that the sum of $8,253.44 was properly spent by respondent in tracing her property; and finally, that H. J. Dowd while acting as broker or fiduciary of respondent, removed from her home all of her records, books, papers and documents relating to her property, real and personal, and has continuously since September, 1952, refused to return them, and that she is entitled to the return thereof.

Appellants contend that the evidence was not only insufficient to support the court's decision, but was inconsistent with such decision. They assert that the testimony of respondent herself repudiated the charge of forgery upon which her handwriting experts had given opinion evidence. ▮ The court rejected a written release dated February 24, 1951, by which Elizabeth Petzold purportedly released appellants from all liability up to that date. This document was introduced in evidence as plaintiff's exhibit 106 when H. J. Dowd was being examined under section 2055, Code of Civil Procedure. Respondent's handwriting expert stated that the signature thereon was a forgery. Although this release was dated prior to the August 16th transaction, and could not therefore bar respondent's claim in relation thereto, if genuine it would have barred recovery on earlier transactions included in the judgment. Appellants maintain that section 448, Code of Civil Procedure, is mandatory, and since no affidavit was filed as required by the code section, respondent may not question the actual execution of the document and the genuiness of the signature. That section requires that when the defense to an action is founded on a written instrument, the genuineness and due execution are deemed admitted unless plaintiff files an affidavit denying same within 10 days and serves a copy upon defendant. However, the findings herein recite that appellants' motion to amend their answer to the first amended complaint was "allowed under the trial of the matter and was deemed denied by plaintiff under oath in the order allowing it." This is a complete answer to appellants' argument. The clerk's transcript, furthermore, shows that this amendment of appellants' answer was not verified

until July 14, 1953, hence when respondent attacked the genuineness and due execution of the instrument through her handwriting expert, on trial at an earlier date, the motion to amend the answer had not yet been made.

Appellants assert that respondent's case was submitted without the production of Elizabeth Petzold as a witness in person or by reading a deposition. It is contended that when she did testify, having been called by appellants under section 2055, Code of Civil Procedure, her answers destroyed the foundation of her claim. Appellants without specific transcript reference (the transcript is 2,043 pages in length) state that Elizabeth Petzold remembered the contract of August 16, 1951, and recognized her own signature upon it; she stated her recognition of literally all of the signatures upon the 57 San Francisco Bank collection cards; she recalled talking to H. J. Dowd about selling all her mortgages and said she thought his buyer was an eastern syndicate named ''Bradford''; she remembered an offer of $34,500; she said that she had wished the money from this transaction to be deposited under the fictitious name of ''Betty Wald'' (a contraction of her maiden name of Betty Maywald) because she didn't want other persons, particularly her husband, to find out what she was doing. In addition to this, the banker, William Bloom, identified the signatures as genuine, and had discussed with Mrs. Petzold the opening of the collection accounts with her on the day that the cards were delivered by Dowd. Appellants maintain that respondent is bound by her own testimony, that it is testimony as to fact, whereas the testimony of her handwriting experts is mere opinion evidence.

In the deposition taken in December, 1952, Mrs. Petzold denied ever hearing of the accounts in the names of Betty Wald and Ford, and denied ever depositing money in those names. She said she never used the name of Wald. She denied receiving a note for $9,500 signed by H. Bradford, but thought that Dorothy Taylor had deposited that sum in the Haight Street Branch of San Francisco Bank for her as part of what Dowd and Dorothy Taylor owed her. Mrs. Petzold estimated that they owed her about $75,000. She said that Dowd was her general manager, that she told him everything. She denied that she signed any papers by which she sold any notes and deeds of trust. She stated that money stopped coming in from her notes and deeds of trust because of Dowd. She said that she guessed that he had sold them to an Eastern syndicate. She did not understand that Dowd was

buying her property, but had discussed with him a sale to the eastern syndicate for a price close to $100,000, then later a price of $75,000. Still later Dowd said that they didn't have the money and she would have to take it on terms, whereupon the deal blew up. Mrs. Petzold when confronted with the survivorship agreement of August 25, 1951, in the names of Ford and Wald, said that the writing did not look like hers.

Because of Mrs. Petzold's physical condition, appellants had been restrained by court order from serving process upon Mrs. Petzold. The trial judge had assured the parties that if it were necessary to take her testimony he would go out to the hospital and hold court there. At appellants' request that was done. At the first hearing at the hospital Mrs. Petzold admitted that she had filed suit against Jack Dowd and the other defendants. She stated that for the three years preceding October, 1952, Dowd had been her exclusive agent, and her exclusive agent part of the time since September, 1945.

Counsel for respondent showed Mrs. Petzold the agreement of August 16, 1951, and asked her if the signature upon it was hers. She answered, ''Yes.'' She admitted also that it was her signature upon a Uniform Agreement of Sale and Deposit Receipt, dated July 11, 1951, which was between her and H. Bradford, but said ''That is my signature, but Bradford, I never had any business with him.'' She testified in like manner about a similar exhibit (Ex. 61).

Mrs. Petzold was questioned in regard to her purported signatures on numerous documents. In regard to Exhibit AA, she said, ''It looks like it; I don't know, I couldn't swear to it.'' As to the signature Betty Wald on Exhibit I, she stated that it was not her writing. She answered ''No'' as to the signature on Exhibit L, a withdrawal receipt. She said she couldn't recognize as hers the endorsement on some of a series of cashier's checks, as to some she said, ''No,'' to others that they looked like hers. One time she answered ''I guess so''; another time, ''doesn't look like it.'' At one point she said ''No, but I will accept it; anything is good enough, I don't care.'' The court then said: ''No, that isn't the point, and she replied ''I'm so tired of it, Judge.'' The court told her to say she wasn't certain when she wasn't positive, and she said ''Let's get through, Judge.''

When Mrs. Petzold was examined in regard to the signatures on the 58 collection cards for the San Francisco Bank which

authorized that bank to make collections on her notes she said that some bore her signature, that as to some she wasn't sure, and that others were not her signature.

In one of the hearings at the hospital she was asked if she hadn't agreed to sell all she had for $34,500, and answered: "Well, I guess if the paper says so, it's so. I just don't remember every detail of it." She also admitted that "Betty Wald" was a nickname for her maiden name of Betty Maywald. Counsel for appellants said "So this money was to be placed in the savings and loan association in the name of 'Betty Wald,' isn't that correct." She answered, "Yes."

From the preceding review of plaintiff's testimony it can be seen that much of it was contradictory, that at times as fatigue set in the witness was ready to accept any signature as hers in order to escape further questioning. The trial judge was certainly better able to pass on her credibility than is this court, and it was for him to decide what part of her testimony, if any, was worthy of belief. ■ That he could accept it in part, and reject it in part, is certainly well established.

Appellants say that the rule is well settled that a party is concluded by his own testimony which is favorable to the adverse party, citing *Braselton* v. *Vokal*, 53 Cal.App. 582 [200 P. 670], and *Trombley* v. *Kolts*, 29 Cal.App.2d 699 [85 P.2d 541]. The first was a case in which it was held that a party could not claim the benefit of a presumption that in the case of a written instrument consideration is presumed, when his own admission under oath showed that there was none. In the second case, it was said that a party may not for his own advantage say that his own testimony is false and that of an opposing witness true. In the instant case, however, the handwriting experts who branded all of the questioned signatures of plaintiff as forgeries, were plaintiff's own witnesses, and not opposing witnesses. *Ringo* v. *Johnson*, 99 Cal.App.2d 124 [221 P.2d 267], cited by appellants, is a case upholding the granting of a nonsuit. It holds that the presumption of due care in plaintiff's favor is dispelled by his own testimony which is directly contradictory to it "under circumstances which afford no indication that the testimony is the product of mistake or inadvertence." The physical condition of the plaintiff in the instant case was such that the trial judge could believe that much of her testimony was the product of inadvertence or mistake. She at times confessed to being tired and confused.

In *Keyser* v. *San Diego Elec. Ry. Co.*, 16 Cal.App.2d 48,

51 [60 P.2d 136], it is said that "The usual rule is that the jury may believe a part of the witness' testimony and disbelieve other parts. Usually this rule must apply to any discrepancies between his testimony on the stand and other statements he may have made, unless it clearly appears that he is not to be believed at all. It has recently been held that a conflict between the testimony of a witness and statements he had previously made in a deposition presented a question of fact for the jury. (Citations.)" In the cited case plaintiff had made an admission against his interest at the time of the accident. His testimony at the trial conflicted with the admission. The court stated that because of the plaintiff's condition and suffering at the time of the accident it could be inferred that respondent was confused by his suffering and had not attempted to make a full and complete statement. We do not believe therefore, as contended by appellants, that the evidence in support of respondent's case conclusively established a defense thereto. (See *Meadows* v. *Emett & Chandler*, 86 Cal.App.2d 1 [193 P.2d 785].)

While appellants state that Mrs. Petzold's testimony was evidence as to fact, while that of the handwriting experts was opinion testimony in regard to her signatures, this is really an argument as to the weight of the evidence. Furthermore it may be said that in numerous instances, Mrs. Petzold merely expressed an opinion as to whether or not it was her signature when she said, "It looks like mine" or "it could be," but stated that she had no memory of the transactions.

It is contended that the supposed fiduciary relationship between Mrs. Petzold and H. J. Dowd was not urged by her at all, and its existence was disproved by uncontradicted evidence. It cannot be questioned, however, that a fiduciary relationship is clearly alleged in the complaint. The record shows that by January, 1951, the three other brokers who had previously done business with Mrs. Petzold, were no longer transacting business with her. Dowd had negotiated sales of all eight pieces of her real property for her. He had prepared her tax returns from 1945 to 1951. He and Dorothy Taylor had arranged for collection of all Mrs. Petzold's notes by the San Francisco Bank. They had negotiated the exchange of several of respondent's notes. Mrs. Petzold, it will be recalled, referred to Dowd as "my general manager."

Appellants say that a real estate broker is not necessarily a fiduciary, citing instances when such an agent may act for both buyer and seller at the same time, and where he may be

principal as well as agent. But in such cases those facts are known to both parties. ▮ The rule is that "the relationship between a broker and his principal is fiduciary in nature, and imposes upon the broker the duty of acting in the highest good faith toward the principal." (9 Cal.Jur.2d 199, § 52). ▮ A broker cannot sell to nor purchase from his principal without the knowledge and assent of the principal, and if he does so it may be set aside at the principal's option. He is therefore liable to his principal for all secret profits secured in such transactions. (See 9 Cal.Jur.2d 203-204, §§ 54, 55; *Rattray* v. *Scudder,* 28 Cal.2d 214 [169 P.2d 371, 164 A.L.R. 1356].) The trial court found that in each transaction herein, respondent dealt solely with H. J. Dowd, that his representations were false, made with intent to deceive and defraud plaintiff, and that she relied upon his statements and had no knowledge of the true facts. There is evidence to support this finding, and it is therefore immaterial that at other times she had done business with different brokers. H. J. Dowd admitted that by August, 1951, he was handling collections on all Mrs. Petzold's notes except those in the hands of the broker Eling. These also were secured from Eling by a letter of authority bearing Elizabeth Petzold's signature, which signature respondent's experts stated was forged. Mrs. Petzold said that for three years prior to October, 1952, she had done business exclusively with Dowd.

As to appellant H. Bradford, she is the record title holder of all deeds of trust owned by respondent on August 16, 1951, except those allegedly assigned by her to J. M. Dowd and his wife, Lauretta. Mrs. Bradford admitted that she allowed her name to be used although she had no interest in the transaction, and received for the use of her name $750 plus $97 per month from August, 1951, to November, 1952. It is clear from Mrs. Bradford's testimony that she knew the deal was a sham, that she did not expect to receive $25,000 from her brother, J. M. Dowd, nor had she made any such agreement with him. J. M. Dowd and his wife are now the record title holders of several of respondent's deeds of trust, many of which they do not claim to own, although they reported the income on them as theirs in 1951.

There was abundant evidence that Dorothy Taylor, while she did not deal directly with Mrs. Petzold, was very active in most of the transactions here involved. It will be recalled that the sum of $20,036.75, the amount of unauthorized with-

drawals from respondent's savings accounts, corresponded to the deposits made in her own bank account.

The complaint herein alleged that all of the other defendants were acting as agents of H. J. Dowd, the broker and fiduciary, in the transaction here involved. The trial court found that in each of the transactions on which the respective defendants were adjudged liable of conversion of respondent's property they were acting as the agents of appellant H. J. Dowd, and as fiduciary of plaintiff. The evidence amply sustains such findings. Appellants Bradford, J. M. Dowd and Lauretta Dowd cannot, therefore, complain of being held fully liable for the damages resulting to respondent from the transaction of August 16, 1951. ■ An agent is guilty of conversion, even if he acts in good faith and in accord with his instructions, if his principal is guilty of conversion. (*Weinberg* v. *Dayton Storage Co.*, 50 Cal.App.2d 750, 756 [124 P.2d 155].) ■ And the judgment against H. J. Dowd is not subject to any reduction because of any benefit his agents may have received therefrom, for a principal is liable for his agent's fraud even if he receives no benefit therefrom. (*Rutherford* v. *Rideout Bank*, 11 Cal.2d 479 [80 P.2d 978, 117 A.L.R. 383], 2 Cal.Jur.2d 846, § 152.) Where an agent knowingly participates with his principal in a transaction which is fraudulent, he is equally responsible with the principal for a return of the money. (*Stirnus* v. *Adams*, 50 Cal. App. 730, 734 [195 P. 955].) Respondent is therefore entitled to recover against such appellants as have been proved to have united with each other in causing her loss. (See *Revert* v. *Hesse*, 184 Cal. 295 [193 P. 943]; *Dandini* v. *Dandini*, 120 Cal.App.2d 211, 214 [260 P.2d 1033].)

■ Appellants claim that damages were awarded in accordance with the speculation of the expert witness, Joe Baum, a certified public accountant who was called as a witness by respondent. Baum made certain calculations based on data supplied to him by counsel for respondent. Using these figures which had been introduced in evidence through testimony of witnesses and exhibits, as a base, he testified as to calculations made therefrom. Appellants say that Baum was not an expert in the field of real property value, or of losses in real property transactions. Furthermore, when an expert's opinion is based not upon his personal observations but upon findings of others, his *opinion* must be excluded. It must be observed that in the instant case, the accountant at no

time rendered an *opinion* on values. He accepted as true the basic figures given to him, and merely stated that, using accepted accounting procedures, certain mathematical results would follow. It was for the trial judge to pass on the validity of those basic figures. Baum used as the basis of his calculation in the note transaction of August 16, 1951, the notes listed as an appendix to that contract and calculated a ''projection'' taking into consideration the monthly payments of principal and interest that respondent would have received. The trial judge made it clear that the accountant was not figuring damages, but simply supplying mathematical calculations from August 16, 1951, to June 15, 1953, the date this action was commenced.

Appellants say that the sum of $39,245.40, the claim on notes that were part of the August 16th contract which were not found in the hands of the receiver, was added to the adjusted over-all value of the total notes in the contract. The finding of the actual value of these notes and deeds of trust in the sum of $145,018.08 is exactly the sum of $105,772.68 and $39,245.40. Plaintiff's Exhibit 60 shows the total claim on the notes as $107,582.77, which Baum later testified had to be adjusted downward because of three notes which were to be eliminated from the list. Plaintiff's Exhibit 120 for identification, which Baum was referring to in his testimony, shows that $105,772.68 was the adjusted claim under the contract of August 16. He testified that the sum of $39,245.40 was the total claim on notes in this contract which he did not find in the hands of the receiver. . The sum of $39,245.40 was necessarily included in the sum of $105,772.68. The notes which he listed as making up the $39,245.40 total when checked against the list of all notes attached to the contract of August 16th, shows that they were also included in the calculation from which the total of $105,772.68 was achieved. From the testimony of the accountant in the record it seems clear that the total of $105,772.68 is the correct figure representing the total claim on this contract.

Respondent in explanation merely refers to the testimony reviewed above, but does not attempt to explain the total, and argues that the correct rule of damages was applied, stating that it is well settled that where money or securities are converted, the owner is entitled prima facie, to a recovery of their face value with interest. (*Revert* v. *Hesse,* 184 Cal. 295 [193 P. 943].) This rule, however, cannot explain how notes of a face value totaling in the neighborhood of $100,000

can become more than $145,000, with the addition of interest for but 22 months. It will be necessary, therefore, to reduce the judgment against the respective defendants by the amount of $39,245.40.

It appears that the findings of $3,996, the value of the equity in the Alvarado Street property is supported by the evidence, as the value was stipulated to as $3,442.51. Later in the trial there was testimony that this figure was several hundred dollars too low.

Appellants attack the measure of damages on the Myrtle Street, Ellert Street and 50 B Manchester Street deals. The damages in these cases appear to be supported by the record. It is the rule that where secret profits are made in real estate transactions by a broker who does not disclose that he is buying the property for himself, he is liable to the principal for all the secret profits realized. (9 Cal.Jur.2d 203, § 54.) The record shows that H. J. Dowd was asked to bring in all his records on the Myrtle Street property, to show what his operating expenses totaled while he held the property, as well as the cost of capital improvements, so that these sums could be deducted.

There was substantial evidence to support the findings as to monies collected and not paid over to respondent, and as to the unauthorized withdrawals from bank accounts.

It is contended that the claims of respondent are barred by the statute of limitations and by laches, but appellants argue only the point of laches. Although respondent says that appellants did not plead facts in their amendment to their answer they did plead such facts in their answer to the first amended complaint, but only in regard to the transaction of August 16, 1951. This, the most recent claim here involved, clearly was not barred by laches. As to all other claims laches was not pleaded, and it is an affirmative defense, and one who relies on such defense must plead facts constituting such laches. (*Carlson* v. *Lindauer*, 119 Cal.App.2d 292, 309 [259 P.2d 925] ; *Phoenix Mut. Life Ins. Co.* v. *Birkeland*, 29 Cal.2d 352 [175 P.2d 5].) Appellants have made no showing that they have been damaged by the respondent's failure to sooner discover their misdeeds. (See *Brownrigg* v. *DeFrees*, 196 Cal. 534 [238 P. 714].) Appellants make much of the fact that a suit was brought against the broker, Jarkich, a witness herein, by Elizabeth Petzold in 1950 for $50,000 in regard to his dealings with her, and that at that time her

attorney talked with Dowd in regard to her latest real estate investments. That there was an action against Jarkich by respondent appears only in the affidavit filed on the motion for a new trial. At any rate, we do not see why the fact that respondent suspected one broker of dishonest dealings, compels the inference that she should have then suspected Dowd and have begun an investigation of his dealings with her.

Appellants maintain that the court below prejudged the case, and that its conduct in this regard viewed cumulatively deprived them of a fair trial. It is true that the court refused Mr. McGuire, counsel for appellants, a continuance when he entered the trial following the abrupt departure of their prior counsel, who left on a European trip. Prior counsel had moved for a continuance on June 3, 1953, and had been denied it by the presiding judge of the superior court. Appellants persisted in trying to get a continuance from the trial judge. Considering the age and very poor physical condition of plaintiff, the court had good reason for not delaying the trial of the matter.

Appellants select a few quotations of remarks of the trial judge from this record of more than 2,000 pages, which are supposed to demonstrate that his mind was closed toward appellants and that he dealt harshly with their counsel. However, a reading of the record discloses that the trial court was equally caustic with the counsel for respondent. In fact, he held him in contempt of court at one time and made him apologize to the court and appellants' counsel. He advised appellant Dowd fully as to his right not to answer questions that might tend to incriminate him because of the criminal proceedings against him which were then pending.

There is no merit in the complaint that more time was needed because the charge of forgery made at the trial could not have been anticipated since it was not raised in the pleadings. However, appellants had their own handwriting expert who testified at length on the same matters as did respondent's experts. Appellants' counsel Albert Picard had been present at the preliminary hearing in the municipal court when Sherwood Morrill, the handwriting expert who testified herein for respondent, testified that certain documents were not signed by respondent. It cannot be said that the trial judge abused his discretion in refusing the continuance in view of the circumstances in this case. (*Slaughter* v. *Zimman*, 105 Cal.App.2d 623, 624 [234 P.2d 94].)

Appellants say that the grounds urged in their motion for a new trial demonstrated the propriety of the continuance request, although they do not argue that the court erred in denying a new trial. In the affidavits of newly discovered evidence, it was alleged that it was discovered that Elizabeth Petzold had filed suit against Jarkich under the name of Elizabeth Seegos, alleging that Jarkich in the past four years had caused certain moneys and securities of hers which he had received for investment purposes to be placed in the name of his wife. Another affidavit was by Marguerite Clydes, a housekeeper who had worked at Elizabeth Petzold's home and who averred that she had seen Mrs. Petzold sign the agreement of August 16, 1951, and also the San Francisco Bank collection cards. Respondent's brief states that Marguerite Clydes was an incompetent confined to the Napa State Hospital, and that the affidavit was actually made there, although this fact was not disclosed to the judge or counsel for respondent at the time it was placed before the court.

As to the Elizabeth Seegos suit, the fact that it was filed in that name would not have precluded appellants from sooner learning of it, since Seegos was the name of a former husband of respondent, it was the name she had used when confined to San Francisco Hospital, and this alias would have been revealed if a reasonably diligent investigation had been made. There was also the affidavit of Ernestine Panzulo, Mrs. Petzold's daughter. She had testified at the trial for appellants, and it became necessary for their counsel to move to impeach her testimony. No showing was made of due diligence in regard to affiant Joseph Risher. He was a former employee of Dowd's and no reason is given as to why he could not have been called as a witness.

There appears to have been no error on the court's ruling in permitting the accountant's schedules to be introduced in evidence, since the court clearly indicated that he would not be bound by them.  ▮  There was no error in sustaining an objection to a question asked the witness Jarkich which was intended to show that he had made a profit in selling a note to respondent. Jarkich's conduct was clearly not an issue in the case.  ▮  As to the error alleged in the examination of the witness, Jericoff, whether or not error was committed, it could not have been prejudicial, since no finding is based upon the testimony to which objection is made.

Accordingly the judgment against each of the respective

defendants, namely, H. J. Dowd, Dorothy Taylor, Harriet Bradford, J. M. Dowd and Lauretta Dowd is hereby reduced in the amount of $39,245.40 and as so reduced, the judgment is affirmed.

Judgment affirmed as modified.

Nourse, P. J., and Dooling, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 25, 1956.