[Civ. No. 24020. First Dist., Div. One. June 5, 1968.]

ELINOR TWOMEY, Plaintiff and Respondent, v. MITCHUM, JONES & TEMPLETON, INCORPORATED, et al., Defendants and Appellants.

Schoichet & Rifkind, Nathan L. Schoichet and Howard D. Sterling for Defendants and Appellants.

M. F. Hallmark and Edward G. Brown for Plaintiff and Respondent.

SIMS, J.—Defendant corporation, which succeeded to the investment banking and stock brokerage business of a partnership of similar name, and the individual defendant, the manager of a local office of the firm, have appealed from a

judgment in favor of a customer which is predicated upon the alleged misfeasance of the defendants and the predecessor partnership.

In 13 points they have voiced objections which may be conveniently grouped as follows: (1) Resort to federal law and to regulations promulgated pursuant to the authority of federal law converted the case to one of exclusive federal jurisdiction, or, alternatively, rendered the judgment erroneous because of an alleged conflict with federal law; (2) the findings exceed the scope of the issues raised by the pleadings and pretrial order; (3) the findings are not sustained by the evidence; (4) the findings are conflicting and incomplete; (5) the action is barred by the applicable statutes of limitation, and the plaintiff's ratification and laches; and (6) the court erred in the computation of damages.

A review of the record and pertinent legal principles reveals that there is no merit in defendants' contentions.

*General findings*

The following findings (for reference numbered as prepared by the trial court) reveal the salient facts of the case. The remaining findings and the evidence are discussed where pertinent.

''4. That in the first part of January 1961 defendant Nankin and the partnership orally agreed with plaintiff to consult with her and to advise her in connection with her investments. That from said date the partnership and the defendants continued to consult with and advise plaintiff in connection with her until plaintiff closed her account with the defendants in July of 1964.

''5. That in the first part of January 1961 plaintiff turned over to defendant Nankin and the partnership securities and cash realized from the sale of investment trust certificates owned by plaintiff in the total value of $52,668.00.

''6. That plaintiff's certificates in the investment trusts were sold by plaintiff and the cash from the proceeds of said sales turned over to the partnership at the direction of the defendant Nankin.

''7. That from the first part of January 1961 to July 1964 the partnership and the defendants were acting as investment advisers to plaintiff and plaintiff placed great trust and confidence in the defendants and in the partnership and relied upon them. That during said period the partnership and the

defendants were acting in a confidential and fiduciary capacity towards plaintiff and the plaintiff relied upon them. That the partnership and the defendants breached said duty to the plaintiff and the plaintiff as a direct and proximate result thereof suffered damages as hereinafter set forth.

"8. That the defendants and the partnership in handling some of the transactions for plaintiff received commissions on sales made to the plaintiff and on sales made for the plaintiff. That in addition to said commissions the partnership and defendants made profits on sales where the partnership and the defendant corporation sold securities to plaintiff and purchased securities from plaintiff where the defendant corporation and the partnership acted as a principal in said transactions.

"9. That from early in January 1961 through July 1964 the partnership and the defendants were carelessly and negligently handling plaintiff's account and as a direct and proximate result thereof plaintiff was damaged in the amounts included in Paragraph 11 of these Findings of Fact. That the defendants and the partnership were acting in a confidential and fiduciary capacity towards plaintiff and that each of them breached said duty towards plaintiff and as a direct and proximate result thereof plaintiff sustained damages thereby in the amounts included in Paragraph 11.

"10. That from early in January 1961 to July 1964 the partnership and the defendants were guilty of fraud and misrepresentation in handling plaintiff's account in the particulars hereinafter set forth. That the partnership and the defendant corporation acted as a principal in selling securities to plaintiff and in purchasing securities from plaintiff and the defendants and the partnership did not advise plaintiff that the partnership and the defendant corporation were acting as a principal in said transactions. That the plaintiff did not know or understand the principal relationship in connection with the purchase and sale of stocks. That plaintiff believed that the partnership and the defendants were acting as a broker on her behalf in handling said transactions and she did not know that the partnership and that the defendant corporation were acting as a principal in said transactions. That the partnership and the defendants manipulated plaintiff's account by having the plaintiff engage in a series of transactions where there was excessive trading in view of the plaintiff's financial position and in view of the size of plain-

tiff's account. That the partnership and the defendants recommended and sold to plaintiff securities which were of a highly speculated [*sic*] nature with little prospect of income when they knew that the plaintiff was a widow and needed income and they knew that said securities were not adapted to her needs. That the partnership and the defendant Nankin told the plaintiff that monthly funds they sent to her for a period of time were profits from their handling of her account whereas in truth only a portion of said funds were realized from profits made in the handling of her account and the rest of the money was realized from the sale of plaintiff's assets. That a number of the stocks purchased and sold by the partnership and the defendants in handling the plaintiff's account were not listed on the New York Stock Exchange or the American Stock Exchange.''

The court awarded the plaintiff $32,356.71, representing the difference between the value of the securities and cash turned over by plaintiff, plus the assumed earnings on the scurities she surrendered, and the sums received from the stockbroker plus the value of the securities returned.

*Alleged conflict with federal jurisdiction and law*

In the course of establishing her case plaintiff introduced into evidence rules 10b-3, 10b-5, 15c1-1, 15c1-2 and 15c1-7 of the General Rules and Regulations under the Securities Exchange Act of 1934 (17 C.F.R. 240.10b-3, etc.), rules 405 and 435(1) of the Rules of the New York Stock Exchange (2 C.C.H. New York Stock Exchange Guide, pars. 2405 and 2435), and sections 2 and 3 of article III, Rules of Fair Practice, N.A.S.D. (National Association of Security Dealers, Manual, p. D-5). Defendants, in turn introduced sections 1, 2, 3, 4, 5 and 6 of article III, Rules of Fair Practice, N.A.S.D. and a ''Review of N.A.S.D. Mark-Up Policy'' interpreting sections 1 and 4 (*id.*, pp. D-5, D-6 and G-1 to G-6).

In opening argument plaintiff asserted, ''. . . under the regulations of the S.E.C., the New York Stock Exchange and the National Association of Security Dealers, . . . there is a violation of those regulations, to show fraud.'' She proceeded to refer to a ''so-called Suitability Rule,'' and made reference to ''over-trading.''

On this appeal plaintiff acknowledges that she relies upon defendants' violations of the foregoing rules in establishing the defendants' fraud and negligence. She contends that she was misled into a course of buying and selling securities of a

highly speculative nature in violation of the provisions of rule 15c1-2 of General Rules and Regulations Under the Securities Exchange Act of 1934,[1] and the provisions of sections 1 and 2 of article III, Rules of Fair Practice of the N.A.S.D.;[2] that her account was excessively traded or ''churned'' in violation of the last-mentioned provisions and the provision of paragraph 2 of rule 435 of the Rules of the New York Stock Exchange;[3] and that her account was not properly supervised as required by the provisions of rule 405 of the New York Stock Exchange.[4]

[1] Securities and Exchange Commission Rule 15c1-2 provides: '' (a) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c)(1) of the Act, is hereby defined to include any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. (b) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c)(1) of the Act, is hereby defined to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under, which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading. (c) The scope of this rule shall not be limited by any specific definitions of the term 'manipulative, deceptive, or other fraudulent device or contrivance' contained in other rules adopted pursuant to section 15(c)(1) of the Act.'' (See also section 10 of the Act [15 U.S. C.A. § 78j]; and rules 10b-3 and 10b-5.)

[2] These provisions are as follows: ''Article III Rules of Fair Practice Section 1. A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade. . . . Section 2. In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.'' (See *R. H. Johnson & Co.* v. *Securities & Exchange Com.* (2d Cir. 1952) 198 F.2d 690, 692, fn. 2; Fishman, *Broker-Dealer Obligations to Customers*—The NASD Suitability Rule (1966) 51 Minn. L. Rev. 233; Lowenfels, *Private Enforcement in the Over-the-Counter Securities Markets: Implied Liability Based on NASD Rules* (1966) 57 Cornell L.Q. 633.)

[3] New York Stock Exchange Rule 435 provides in part: ''No member, member organization, partner or stockholder therein shall: . . . (2) Execute or cause to be executed on the Exchange purchases or sales of any stock for any account with respect to which he or it or another partner or stockholder therein is vested with any discretionary power, which purchases or sales are excessive in size or frequency in view of the financial resources in such account.''

[4] N.Y.S.E. rule 405 provides in part: ''Every member organization is required through a general partner or an officer who is a holder of voting stock to (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization. . . . (2) Supervise diligently all accounts handled by registered representatives of the

It further appears the findings with respect to the broker acting as principal in selling to and buying from the customer is the subject of rule 15c1-4 of the Securities and Exchange Commission;[5] and that the compensation to the broker where he acts as principal is the subject of section 4 of article III of Rules of Fair Practice of the N.A.S.D., and the remainder of the exhibit introduced by defendants. At the trial reference was also made to rules of the National Association of Securities Dealers and to rules of the New York Stock Exchange which were designed to prevent sale of mutual funds which had only been held for a short period.

Under the provisions of the Securities Exchange Act of 1934 (June 6, 1934, c. 404, 48 Stat. 881; 15 U.S.C.A., § 78a et seq.) the Securities and Exchange Commission is vested with "power to make such rules and regulations as may be necessary for the execution of the functions vested in" it by the Act. (*Id.*, § 23; 15 U.S.C.A. § 78w; and see §§ 10b and 15c; 15 U.S.C.A. §§ 78j(b) and 78o(c).) Through the registration of national securities exchanges the Commission is given supervisory power of the rules of the registering exchange to the end that such rules shall "include provision for the expulsion, suspension or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade." (*Id.*, § 6(b); 15 U.S.C.A. § 78f(b).) Similarly, through registration of associations of brokers or dealers, like standards are imposed on members of such associations. (*Id.*, § 15c(b)(8); 15 U.S.C.A. § 78o-3(b)(8) [formerly subpar. (7)].)

In addition to providing for the regulation of security exchanges and those engaged in the issuance and sale of

organization." (Cf. *R. H. Johnson & Co.* v. *Securities & Exchange Comn.*, *supra*, 198 F.2d 690, 693, fn. 7; Lowenfels, *Implied Liability Based Upon Stock Exchange Rules* (1966) 66 Colum. L.Rev. 12, 13-16.)

[5] S.E.C. rule 15c1-4 directs that the broker or dealer, at or before the completion of each transaction shall give or send to the customer "written notification disclosing (1) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other persons; and (2) in any case in which he is acting as a broker for such customer or for both such customer and some other person, either the name of the person from whom the security was purchased or to whom it was sold for such customer and the date and time when such transaction took place or the fact that such information will be furnished upon the request of such customer, and the source and amount of any commission or other remuneration received or to be received by him in connection with the transaction."

securities, the Act expressly gives the customer a right of action when the dealer or broker has wilfully engaged in certain manipulative practices (*id.*, § 9(3) ; 15 U.S.C.A. § 78i(e)) ; or when a person has made false or misleading statements in any application, report or document filed under the Act (*id.*, § 18(a) ; 15 U.S.C.A. § 78r(a)). Under section 16(b) recovery may be had by or on behalf of a corporation for profits made in certain "inside" transactions (15 U.S.C.A. § 78p). Orders of the Commission are reviewable in the United States Court of Appeals (*id.*, § 25; 15 U.S.C.A. § 78y).

Section 27 reads in part: "The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. . . ." (15 U.S.C.A. § 78aa.)

When the proceedings involve the Securities and Exchange Commission it is clear that review may only be had in the manner provided in the Act (*Securities & Exchange Com.* v. *Andrews* (2d Cir. 1937) 88 F.2d 441, 441-442), and that state courts cannot interfere with the exercise of the Commission's jurisdiction (*Johnson* v. *McNeill* (1942) 151 Fla. 606, 611-612 [10 So.2d 143, 145]), or with proceedings of registered associations which are subject to review by the Commission. (*Rudolph* v. *Fulton* (1960) 178 Cal.App.2d 339, 341-342 [2 Cal.Rptr. 807] ; *Barnett & Co.* v. *National Assn. of Security Dealers, Inc.* (1960) 23 Misc.2d 213, 215 [202 N.Y.S. 2d 136, 138], affd. (1960) 11 App.Div.2d 681 [204 N.Y.S.2d 79].)

When the claim is one predicated upon a right expressly created by the Act, it has been held that jurisdiction is in the federal courts to the exclusion of state courts. In *American Distilling Co.* v. *Brown* (1945) 295 N.Y. 36 [64 N.E.2d 347], the court upheld the dismissal of a complaint brought by a "corporation to recover from the defendant, one of its officers and directors, profits alleged to have been realized by him from purchases and sales of plaintiff's common stock within periods less than six months." It was recognized that "Plaintiff's right to recover is predicated upon section 16, subdivision (b), of the Act of Congress of June 6, 1934 . . . known

as 'Securities Exchange Act of 1934.' '' (295 N.Y. at p. 39.) The court reconciled an alleged discrepancy between the provisions of section 27, *supra*, and reference in section 16(b) to "any court of competent jurisdiction," by limiting the latter to the courts which were prescribed in the former. Grounds for this result were found in the history of debates on the measure which revealed a studied attempt to provide for exclusive federal jurisdiction (*id.*, pp. 40-42).

Subsequent New York cases have not only applied the exclusive federal jurisdiction principle to the private rights particularly created by the Act, but also to private civil suits which are expressly predicated upon an implied liability arising from breach of the provisions of the Act, or a rule or regulation promulgated pursuant to authority conferred by the Act.[6]

The Delaware Supreme Court, in an action to review a corporate election, refused to consider whether the statements

---

[6]See *Newman* v. *Baldwin* (1958) 13 Misc.2d 897, 898, 902 [179 N.Y.S. 2d 19, 23] [recognizing exclusive jurisdiction of action under section 16(b)]; *Mekrut* v. *Gould* (1959) 16 Misc.2d 326, 329-330 [188 N.Y.S.2d 6, 9] [refusal to consider violation of restriction on borrowing under section 8 (15 U.S.C.A. § 78h) in support of complaint for fraud]; *Malkan* v. *General Transistor Corp.* (1960) 27 Misc.2d 677, 679 [207 N.Y.S.2d 345, 347] [motion to restrain company from counting or validating any proxies on the grounds that the statements sent to the stockholders violated subdivision (a) of section 14 of the Act (15 U.S.C.A. § 78n) denied]; *White* v. *Ludwig* (1961) 32 Misc.2d 120, 122 [223 N.Y.S.2d 316, 318] [leave granted to amend to show common law action and action under Investment Company Act of 1940 (15 U.S.C.A. § 80a-1 et seq., see particularly § 80a-43), but motion to dismiss granted absolutely as to unspecified alleged violations of Securities Exchange Act of 1934 (15 U.S.C.A. § 78o et seq., see particularly § 78aa, *supra*)]; *Levine* v. *Silverman* (1964) 43 Misc.2d 415, 417 [251 N.Y.S.2d 68, 70] [dismissal of a cause of action predicated upon subdivision (b) of section 10 (15 U.S.C.A. § 78j(b)) making it unlawful to use any instrument of interstate commerce to deceive in effecting a sale of securities]; *Gallo* v. *Maȝer* (1966) 50 Misc.2d 385, 387 [270 N.Y.S.2d 295, 299] [on denial of motion to stay state action, distinction between federal action expressly predicated on violation of sections 10(b) and 15(c)(2) of the Act (15 U.S.C.A. §§ 78j(b) and 78o(c)(2)) and S.E.C. rules X-10(b)-5 and 15(c)(1)-2 (17 C.F.R., §§ 240.10b-5 and 240.15c1-2), and state action based on breach of contract and common law fraud recognized]; *Mitchell* v. *Bache & Co.* (1966) 52 Misc.2d 985, 987-989 [277 N.Y.S.2d 580, 582-583] [dismisses action insofar as it is predicated upon breach of credit regulations promulgated in Regulation T of the Board of Governors of the Federal Reserve System pursuant to section 7(a) of the Act (see 15 U.S.C.A. § 78g, and 12 C.F.R., §§ 220 et seq., particularly § 220.4(c)(2)]; *McCollum* v. *Billings* (1967) 53 Misc.2d 661, 663-666 [279 N.Y.S.2d 609, 613-616] [dismissing cause of action expressly predicated upon breach of sections 10(h), 15(c)(1) of the Act and S.E.C. regulations 10(b)-5, 15(c)(1)-2, 15(c)-7(a) (15 U.S.C.A. §§ 78j(b) and 78o(c)(1)'; 17 C.F.R., §§ 240.10b-5, 240.15c1-2 and 240.15c1-7(a)).]

disseminated in connection with the solicitations of proxies complied with section 14(a) of the Securities Exchange Act of 1934, or the rules promulgated under that section (15 U.S.C.A. § 78n(a); and S.E.C. regulations, rule X-14-A-1 [see 240 C.F.R., § 14a-1]). The court stated: "This issue lies solely within the exclusive jurisdiction of other tribunals under Section 27 of the Act, and this Court will not usurp that jurisdiction or any portion thereof. It is understandable why the legislative intent as to jurisdiction was so clearly expressed under Section 27, for, if uniformity of enforcement in the true sense is the object of the purpose to be attained, centralization of judicial decision and discretion should be as designated." (*Standard Power & Light Corp.* v. *Investment Associates, Inc.* (1947) 29 Del.Ch. 593, 606 [51 A.2d 572, 579]. See also *American Hardware Corp.* v. *Savage Arms Corp.* (1957) 37 Del.Ch. 59, 65 [136 A.2d 690, 693]; *Malkan* v. *General Transistor Corp.* (1960) 27 Misc.2d 677, 679 [207 N.Y.S.2d 345, 347]; *Eliasberg* v. *Standard Oil Co.* (1952) 23 N.J. Super. 431, 444 [92 A.2d 862, 869]; comment on *Standard Power & Light* and question of jurisdiction in general, 2 Loss, Securities Regulation (2d ed. 1961) 973-1001; 3 *id.* 2005-2007; Annotation (1946) 165 A.L.R. 1232, 1236; Fishman, *Stockbrokers and the Public Investor* (1965) 53 Ill. Bar J. 992, 1004; Note, *State Enforcement of Federally Created Rights* (1960) 73 Harv.L.Rev. 1551; Note, *Exclusive Jurisdiction of the Federal Courts in Private Civil Actions* (1957) 70 Harv.L.Rev. 509.)

██ It has been generally recognized in the federal courts that a breach of the Act or a S.E.C. rule or regulation will give rise to a civil suit to recover damages even though that remedy is not expressly provided by the law or regulation. (*Ellis* v. *Carter* (9th Cir. 1961) 291 F.2d 270, 272-274; *Fischman* v. *Raytheon Mfg. Co.* (2d Cir. 1951) 188 F.2d 783, 787; *Lorenz* v. *Watson* (D.Pa. 1966) 258 F.Supp. 724, 730; *Kardon* v. *National Gypsum Co.* (D.Pa. 1947) 73 F.Supp. 798, 800 and 802-803 [as modified in 83 F.Supp. 613]; and same case (1946) 69 F.Supp. 512, 513. See also Lowenfels, *Implied Liabilities Based upon SEC Rules* (1966) 66 Colum.L.Rev. 12, 13-16; Fishman, *op. cit.*, 53 Ill.Bar.J. 992; Cohen, *"Truth in Securities"* *Revisited* (1966) 79 Harv.L.Rev. 1340, 1364-1366; Note, *Civil Liability Under Section 10B and Rule 10B-5* (1965) 74 Yale L.J. 658, 682-690; Cohen and Rabin, *Broker-Dealer Selling Practice Standards: The Importance of*

*Administrative Adjudication in Their Development* (1964) 29
Law & Contemp. Prob. 691, 710; Comment, *Prospects for Rule
X-10B-5* (1950) 59 Yale L.J. 1120, 1133-1135.)

In *Kardon* the court stated: "It is not, and cannot be,
questioned that the complaint sets forth conduct on the part
of the Slavins directly in violation of the provisions of Sec.
10(b) of the Act and of Rule X-10B-5 which implements it. It
is also true that there is no provision in Sec. 10 or elsewhere
expressly allowing civil suits by persons injured as a result of
violation of Sec. 10 or of the Rule. However, 'The violation of
a legislative enactment by doing a prohibited act, or by fail-
ing to do a required act, makes the actor liable for an invasion
of an interest of another if; (a) the intent of the enactment is
exclusively or in part to protect an interest of the other as an
individual; and (b) the interest invaded is one which the
enactment is intended to protect. . . .' Restatement, Torts,
Vol. 2, Sec. 286. This rule is more than merely a canon of
statutory interpretation. The disregard of the command of a
statute is a wrongful act and a tort." (69 F.Supp. at p. 513.
See also authorities collected *Fischman v. Raytheon Mfg. Co.,
supra,* at p. 787, fn. 4.)

The second circuit has refused to accept jurisdiction on the
theory that a breach of stock exchange rules, recognized by
the provisions of sections 6(b) and 15A(b)(8) of the Act,
gives rise to an implied federally created civil liability under
the Act. (*Colonial Realty Corp.* v. *Bache & Co.* (2d Cir. 1966)
358 F.2d 178, 180-183 (cert. denied (1966) 385 U.S. 817 [17
L.Ed.2d 56, 87 S.Ct. 40]). See also *O'Neill* v. *Maytag* (2d Cir.
1964) 339 F.2d 764, 770; and Lowenfels, *op.cit.,* 66 Colum.L.
Rev. 12, 21-24.) The plaintiff relied on the broker's alleged
"failure to conduct its dealings in a manner 'consistent with
just and equitable principles of trade' " as that phrase is used
in the sections last referred to, in the Constitution of the New
York Stock Exchange, and in the By-Laws and Rules of Fair
Practice of the National Association of Securities Dealers,
Inc. The court noted, "Implication of a private right of
action may be suggested by explicit statutory condemnation of
certain conduct and a general grant of jurisdiction to enforce
liabilities created by the statute, as in cases under §§ 10 and
14 of the Act, see *Fischman* v. *Raytheon Mfg. Co.* (2d Cir.
1951) 188 F.2d 783; *J. I. Case Co.* v. *Borak, supra,* [(1964)
377 U.S. 426 (12 L.Ed.2d 423, 84 S.Ct. 1555)] or from such
considerations as the protection intended by the legislature

and the ineffectiveness of existing remedies, administrative and judicial, fully to achieve that end. See *Baird* v. *Franklin, supra,* 141 F.2d at pp. 244-245; 2 Loss, Securities Regulation 945 (1961)." (358 F.2d at p. 181.) It refused to apply these principles to an alleged breach of the generally phrased stock exchange rule because it concluded that Congress indicated by its reliance on disciplinary proceedings that it did not intend violations of all rules adopted under 6(b) to give rise to civil liability, and because section 27, as distinguished from section 29(a) does not refer to exchange rules (*id.,* pp. 181-182). The court observed, however, that there might be rules which were adopted to implement the Congressional purpose which could give rise to a private right of action under the Act, particularly where the rule imposes a duty unknown to the common law (*id.,* p. 182). The general rule in question was interpreted as not imposing a new legal standard different from that recognized by state law. The court opined that an action for the act or omission, giving rise to the charge of violation of the generally phrased rule, should be left to a state court, and that acknowledgment of federal jurisdiction over private action for breach of exchange rules would oust the state courts of the power to adjudicate customer-broker suits between their own citizens (*id.,* p. 183).

The foregoing opinion implies that federal jurisdiction over a private right of action predicated upon a breach of the Act, or of a rule or regulation of the S.E.C. (as distinguished from a rule of a stock exchange or association), is exclusive under section 27 whether predicated upon a right of action expressly conferred by the Act or implied from its terms (358 F.2d at p. 183). In *Beury* v. *Beury* (D.W.Va. 1954) 127 F.Supp. 786, the court stated: "I conclude that the only reasonable construction of this statute is that it confers exclusive civil jurisdiction on federal courts to entertain only those actions which involve some right of recovery which goes beyond those common law rights which might have been fully adjudicated and enforced by appropriate action in a state court, (or in a federal court on grounds of diversity of citizenship) before the Securities Exchange Act of 1934 was passed." (127 F.Supp. at p. 790.) As a result the court refused to entertain an action allegedly brought under rule X-10B-5 when the complaint failed to show other than a breach of common law duties (*id.*).

On the other hand in *Matheson* v. *Armbrust* (9th Cir. 1960)

284 F.2d 670, the court recognized that there may be situations where the defendant party may have concurrent state and federal remedies. The court observed: "This action is based upon a violation of section 10(b) of the act and rule X-10B-5, and is therefore governed by section 27 of the act. This section expressly confers exclusive jurisdiction on the district courts with respect to all suits in equity and actions at law brought to enforce any liability or duty created by section 10(b) and rule X-10B-5. Section 28(a) of the act, 15 U.S.C.A. § 78bb(a), recites in part that the rights and remedies provided by the act 'shall be in addition to any and all other rights and remedies that may exist at law or in equity. . . .'

"Actions brought to enforce any liability or duty created by section 10(b) and rule X-10B-5 are therefore additional to state and any other federal actions. Appellee, as plaintiff, may have had a choice between suing in state or federal court to recover damages for the fraud which appellant perpetrated. If so, the long-established principle is applicable, that 'the party who brings a suit is master to decide what law he will rely upon.' *The Fair* v. *Kohler Die & Specialty Co.*, 228 U.S. 22, 25 [57 L.Ed. 716, 717, 33 S.Ct. 410, 411].

"We therefore hold that the fact that appellee may have had an adequate civil remedy in the courts of Oregon did not deprive the district court of jurisdiction over the subject matter of this cause of action." (284 F.2d at pp. 673-674.)

The New York decisions (see fn. 6, *supra*) have recognized that an action for common law fraud may be entertained in the state court even though it has been joined with a nonjurisdictional cause of action predicated upon an express or implied right under the Act. (See *McCollum* v. *Billings* (1967) 53 Misc.2d 661, 666-667 [279 N.Y.S.2d 609, 616-617]; *Gallo* v. *Mayer* (1966) 50 Misc.2d 385, 386-387 [270 N.Y.S.2d 295, 298-299]; *Levine* v. *Silverman* (1964) 43 Misc.2d 415, 416 [251 N.Y.S.2d 68, 69]; and *White* v. *Ludwig* (1961) 32 Misc.2d 120, 122 [223 N.Y.S.2d 316, 318].) In *McCollum* v. *Billings, supra,* the plaintiff alleged that she was damaged because the broker-dealers failed "to exercise their skill and competence in that they 'churned' plaintiff's account, took secret profits and invested in speculative stocks, . . ." (*Id.,* p. 663 [*id.,* p. 612].) The opinion further recites: "We turn now to the motions to dismiss the second cause of action on

the ground that it fails to state a cause of action. Nowhere in the second cause of action is there any reference to the Federal Act or Regulations promulgated thereunder notwithstanding the fact that the alleged acts of wrongdoing on the part of defendants are identical to those charged in the first cause of action. However, the specific acts of wrongdoing charged to defendants in this cause of action (par. 11) must be read in connection with paragraph 10, the first portion of paragraph 11 and paragraph 12 of plaintiff's complaint which allege in substance that defendants represented and held themselves out as having special skill and competence to invest and re-invest funds (par. 10). That plaintiff entrusted cash and securities to defendants in reliance thereon (par. 10) and that defendants 'breached their duties to plaintiff and failed to exercise their special skill and competence in the investment of such cash and securities by' committing the specific acts of wrongdoing therein set forth (par. 11). That 'by reason of such breach of defendants' duties and their failure to exercise their special skill and competence, plaintiff has been damaged. . . .' (Par. 12).

''Defendants contend that the court is without jurisdiction to entertain the action since the alleged acts of dereliction on the part of defendants are the same acts charged in the first cause of action and if there is any merit to the allegations, they constitute, at best, violations of the Act and the regulations thereunder which fall within the exclusive jurisdiction of the federal courts. We do not agree with this argument. As has already been pointed out, the rights and remedies provided by the Securities Exchange Act of 1934 'shall be in addition to any and all other rights and remedies that may exist at law or in equity . . .' (Sec. 28(a) [U.S.C. Title 15, sec. 78bb(a)]; . . .'' (*Id.*, at pp. 666-667 [*id.*, at pp. 616-617].)

The similarity to the case at bar is apparent. It is concluded that the courts of this state have jurisdiction over the causes of action set forth in plaintiff's complaint, and may properly receive proof in support of her claims. Insofar as causes of action not recognizable at common law are concerned, the courts, under the compulsion of the provisions of section 27, have rejected the unqualified application of the principle that ''the public policy expressed in the Act of deterring the practices proscribed therein, will be upheld by making the private rights created more widely available.''

(See Callahan, J., dissenting on hearing in appellate division, *American Distilling Co.* v. *Brown* (1945) 269 App.Div. 763, 764 [54 N.Y.S.2d 855, 857].) Yet it is clear that there is hesitancy to engulf all common law fraud actions in the sea of federal jurisdiction and to deprive the state courts of jurisdiction over such actions. (See *Colonial Realty Corp.* v. *Bache & Co., supra*, 358 F.2d 178, 183; *Matheson* v. *Armbrust, supra*, 284 F.2d 670, 673; *Lorenz* v. *Watson, supra*, 258 F.Supp. 724, 731-732 and 735; Note, *Churning by Securities Dealers* (1967) 80 Harv.L.Rev. 869, 882-883 and 885; Cohen and Rabin, *Broker-Dealer Selling Practice Standards: The Importance of Administrative Adjudication in Their Development, supra*, 29 Law & Contemp. Prob., 691, 695, and 702; Note, *Problems of Parallel State and Federal Remedies* (1958) 71 Harv.L.Rev. 513; Hart, *The Relations Between State and Federal Law* (1954)ˑ 54 Colum.L.Rev. 489, 506; Lowenfels, *op. cit.*, 66 Colum.L.Rev. 12, 29.) The question resolves itself into whether or not the pleadings, proof and findings are sufficient to show a breach of duty by defendants which is cognizable under the law of this state.

*Scope of the issues raised*

In its filed memorandum of decision the court stated it was granting plaintiff judgment "on the ground that defendants [were] and each of them was acting in a confidential and fiduciary capacity towards said plaintiff." This statement of ultimate fact was incorporated in paragraphs "7" and "9" of the findings as quoted above.

Defendants contend that neither the complaint nor the pretrial conference order raised the issue of the capacity in which the defendants acted toward plaintiff, and that the findings are erroneous since they were beyond the scope of the issues of the case. (See Cal. Rules of Court, rule 216; *Albers* v. *State Board of Equalization* (1965) 237 Cal.App.2d 494, 498 [47 Cal.Rptr. 69] and cases cited; and *Fitzsimmons* v. *Jones* (1960) 179 Cal.App.2d 5, 8-10 [3 Cal.Rptr. 373].)

In paragraph IV of the first cause of action in the complaint, which paragraph is incorporated in each of plaintiff's remaining four causes of action, plaintiff alleged, "That on or about January 12, 1961, plaintiff consulted with the defendant Sheldon Nankin as a representative of the defendants, Mitchum, Jones & Templeton, Incorporated, and orally agreed with said. defendants that they would act as her investment counselor and stockbroker." In paragraphs VII and VIII,

similarly incorporated in each of the other causes of action, she alleged, "That at all times herein mentioned defendants were acting as the business and financial advisor of plaintiff and that she placed a special confidence and reliance upon their declarations and representations"; and "That defendants from January 21, 1961 through April 30, 1964 acted as plaintiff's investment counselors and during said period defendants received various commissions and profits from handling plaintiff's investments the exact amount of which commissions and profits are unknown to plaintiff." In her last cause of action, she alleged, "That defendants falsely and fraudulently represented to plaintiff that they would exercis[e] good faith and judgment in handling her investment account . . ."

One of the issues in dispute set forth in defendants' pretrial statement was: "Whether the defendants agreed to act as investment Counselor and stock broker for plaintiff." Another was: "Whether defendants acted as plaintiff's business and financial adviser in whom she placed special confidence." Plaintiff stated the issues more tersely, and the court adopted the language of her pretrial statement in its pretrial conference order. The order states: "This is an action for damages wherein plaintiff alleges that she delivered to defendants certain cash and securities and that defendants were to act as her investment counselors and stock brokers. . . . ISSUES 1. Nature and extent of oral agreement. . . . 5. Did defendants improperly handle plaintiff's account. . . . 7. Were defendants guilty of fraud in handling plaintiff's account. . . ."

Defendants' contention is apparently predicated upon the fact that the phrase "confidential and fiduciary capacity" is not found in the pleadings or in the pretrial conference order. ▮ This argument completely disregards the following principle: "Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. The very existence of such a relation precludes the party in whom the trust and confidence is reposed from participating in profit or advantage resulting from the dealings of the parties to the relation. [Citations.]" (*Estate of Cover* (1922) 188 Cal. 133, 143 [204 P. 583]. See also Civ. Code § 2219; *Vai v. Bank of America* (1961) 56 Cal.2d 329, 337-338 [15 Cal.Rptr. 71, 364 P.2d 247]; *Estate of Arbuckle*

(1950) 98 Cal.App.2d 562, 568-569 [220 P.2d 950, 23 A.L.R.2d 372] ; *Sime* v. *Malouf* (1949) 95 Cal.App.2d 82, 98-99 [212 P.2d 946, 213 P.2d 788] ; and *Bacon* v. *Soule* (1912) 19 Cal.App. 428, 434 [126 P. 384].) ▪ The pleadings and the pretrial order reflect that plaintiff was contending that the defendants and the partnership had undertaken to act for her as agents, and more particularly as investment counselors and stock brokers. "An agent is a fiduciary. ▪ His obligation of diligent and faithful service is the same as that imposed upon a trustee. (Civ. Code, § 2322, subd. 3, Rest., Agency, § 13 [further citations].)" (*Rodes* v. *Shannon* (1963) 222 Cal.App.2d 721, 725 [35 Cal.Rptr. 339], and see discussion and authorities cited pp. 726-727. See also *Gerhardt* v. *Weiss* (1966) 247 Cal.App2d 114, 117 [55 Cal.Rptr. 425] ; *Estate of Arbuckle, supra,* 98 Cal.App.2d 562, 569; *Kinert* v. *Wright* (1947) 81 Cal.App.2d 919, 925 [185 P.2d 364] ; and 1 Witkin, Summary of Cal. Law (1960) Agency and Employment, § 26, p. 404.) ▪ "The relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal. (*Wells Fargo Bank* v. *Dowd,* 139 Cal.App.2d 561 [294 P.2d 159] ; *Quistgard* v. *Derby,* 114 Cal.App.2d 271 [250 P.2d 2].)" (*Abrams* v. *Bendat* (1958) 165 Cal.App.2d 89, 95 [331 P.2d 657], and see cases cited.) With respect to stockbrokers it is recognized, "The duties of the broker, being fiduciary in character, must be exercised with the utmost good faith and integrity." (*Meyer,* The Law of Stockbrokers and Stock Exchanges (1931) p. 253. See also *id.,* §§ 39-40, pp. 249-253 ; and *Walsh* v. *Hooker & Fay* (1963) 212 Cal.App.2d 450, 452 [28 Cal.Rptr. 16].)

In *Gerhardt* v. *Weiss, supra,* the court noted a general allegation of breach of fiduciary duty, but further stated : "Written proof of the creation of an agency relationship was clearly pleaded in the complaint. If the evidence should support the averments of the complaint there could be no doubt that a fiduciary relationship between Weiss and Gerhardt existed and that Weiss was required to act in accordance with the trust he had undertaken." (247 Cal.App.2d at pp. 116-117.) So here proof of the agency, as alleged, established the ultimate facts found. Although *Walsh, supra,* indicates that an amendment is necessary and proper where the relationship of the parties was incorrectly alleged, it depends for its vitality not on the amended allegation of the conclu-

sion of fiduciary relationship, but on the change in the allegation of the status of the relationship of the parties from vendee-vendor to principal-agent, which supported that conclusion. (See 212 Cal.App.2d at pp. 452-454. Cf. *Cullinan* v. *Mercantile Trust Co.* (1926) 80 Cal.App. 377, 383-384 [252 P. 647].)

The court found in finding ''10'': ''That from early in January 1961 to July 1964 the partnership and the defendants were guilty of fraud and misrepresentation in handling plaintiff's account in the particulars hereinafter set forth. . . .'' Defendants contend that fraud was never sufficiently alleged in the complaint. They rely upon the following statement: ''Actual fraud involves conscious misrepresentation, or concealment, or non-disclosure of a material fact which induces the innocent party to enter the contract. (Civ. Code, § 1572; *Pearson* v. *Norton*, 230 Cal.App.2d 1, 7 [40 Cal.Rptr. 634]; Rest., Contracts, § 471.) A complaint for fraud must plead misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance and resulting damage. (*Sixta* v. *Ochsner*, 187 Cal.App.2d 485, 489 [9 Cal.Rptr. 617]; *Zinn* v. *Ex-Cell-O Corp.*, 148 Cal.App.2d 56, 68 [306 P.2d 1017].) While the amended complaint charged misrepresentation, it failed to assert the elements of knowledge of falsity, intent to induce reliance, and justifiable reliance. A cause of action for fraud was therefore not stated. (*Norkin* v. *United States Fire Ins.*, 237 Cal.App.2d 435 [47 Cal.Rptr. 15].)'' (*Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 128-129 [54 Cal.Rptr. 533]. See in addition to the cases cited, *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 422 [159 P.2d 958]; *Doctor* v. *Lakeridge Constr. Co.* (1967) 252 Cal.App.2d 715, 718 [60 Cal.Rptr. 824]; *Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272, 291-293 [55 Cal.Rptr. 610]; *Sime* v. *Malouf, supra*, 95 Cal.App.2d 82, 99-101; and *Bacon* v. *Soule, supra*, 19 Cal.App. 428, 435.)

The complaint in the instant case alleged: ''That defendants falsely and fraudulently represented to plaintiff that they would exercis[e] good faith and judgment in handling her investment account''; that ''defendants entered into a course of buying and selling numerous securities of a speculative nature in connection with the plaintiff's account and defendants purchased securities of doubtful value with little prospect of any income with full knowledge that said investments were not adaptable to the plaintiff's need''; that

plaintiff turned over cash and securities to the defendants, who received commissions and profits from handling plaintiff's investments; that plaintiff "placed a special confidence and reliance upon their declarations and representations"; and that she was damaged. The knowledge of the falsity of the representation and the intention not to perform as represented may be inferred from the subsequent conduct of the representer. (*Boyd* v. *Bevilacqua, supra,* 247 Cal.App.2d 272, 292.) The fact that plaintiff turned over cash and securities to defendants and that they profited from handling her account supports the conclusion that the alleged representations were made to produce this result. There is no question but that plaintiff has alleged her reliance and damage.

Defendants in their pretrial statement acknowledged that the issues included the following questions: "Whether defendants made any false and fraudulent representations to plaintiff"; and "Whether plaintiff was entitled to rely on any such representations." In its order the court adopted plaintiff's statement which read, "were defendants guilty of fraud in handling plaintiff's account."

Although the foregoing pleadings and order may, as indicated, establish the elements of actual fraud, it is clear from the findings that the issue determined refers to constructive fraud arising out of the relationship of the parties. In *Odorizzi, supra,* upon which defendants rely, the court stated: "Constructive fraud arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice. (Civ. Code, § 1573.) Plaintiff has attempted to bring himself within this category, for the amended complaint asserts the existence of a confidential relationship between the school superintendent and principal as agents of the defendant, and the plaintiff. Such a confidential relationship may exist whenever a person with justification places trust and confidence in the integrity and fidelity of another. (*Vai* v. *Bank of America,* 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247]; *Pryor* v. *Bistline,* 215 Cal.App.2d 437, 446 [30 Cal.Rptr. 376].)" (246 Cal.App. 2d at p. 129. See in addition to the cases cited, *Hobart* v. *Hobart Estate Co., supra,* 26 Cal.2d 412, 432-433; *Boyd* v. *Bevilacqua, supra,* 247 Cal.App.2d 272, 290-291; *Gerhardt* v. *Weiss, supra,* 247 Cal.App.2d 114, 116; *Efron* v. *Kalmonovitz* (1964) 226 Cal.App.2d 546, 549-560 [38 Cal.Rptr. 148]; *Whipple* v. *Haberle* (1963) 223 Cal.App.2d 477, 486 [36

Cal.Rptr. 9]; *Estate of Arbuckle, supra,* 98 Cal.App.2d 562, 569; *Sime* v. *Malouf, supra,* 95 Cal.App2d 82, 97-99; *Bacon* v. *Soule, supra,* 19 Cal.App. 428, 435; and Note, *Churning by Securities Dealers, supra,* 80 Harv.L.Rev. 869, 882-883.)

The allegations concerning the relationship of the parties and subsequent acts of the defendants are clearly sufficient to raise an issue of breach of a fiduciary relationship constituting constructive fraud.

*Sufficiency of the evidence*

■ Defendants contend that there is no evidence in the record to support the recital in finding "9" that "the defendants and the partnership were acting in a confidential and fiduciary capacity towards plaintiff and that each of them breached said duty towards plaintiff . . ." (See also finding "7"), to support the recital in finding "10" that "the partnership and the defendants were guilty of fraud and misrepresentation," to support any finding that defendants acted improperly, fraudulently or negligently in the handling of plaintiff's investment account, to show that defendants did not scrupulously perform every duty owing to plaintiff, or to show that defendants did not comply with all the regulatory standards required under the Securities Exchange Act and other applicable laws and regulations.

The evidence shows that some time early in 1959, plaintiff, a widow, contacted defendant Nankin, then a stockbroker with the firm of Merrill Lynch, Pierce, Fenner & Smith. Plaintiff, who had no experience in handling securities or stocks, apparently selected Nankin because he had taken care of some stock transactions for her husband. At his suggestion, Mrs. Twomey in February or March of 1959 purchased shares of Royal Industries and Crestomont Oil Co. Later in 1959, after Nankin had become associated with defendant Mitchum, Jones and Templeton, plaintiff purchased more shares of Royal Industries, and against his advice, purchased a money-losing stock called Foamettes.

In 1959, Mrs. Twomey also invested some $25,000 in preferred stocks, through the firm of Dean Witter. In the same year plaintiff sold the preferred stock and bought $45,000 worth of mutual funds, again through Dean Witter.

Nothing significant occurred until January 1961 when plaintiff again contacted Nankin at Mitchum, Jones. She told him, "I had some securities and some mutual funds and that . . . at the present time I had no one to advise me what

to do with them, and that I wanted him to tell me what to do." Plaintiff's testimony in this regard is as follows: "A. When I went in to see him, I brought my portfolio of the securities I had on hand at that time, and I asked him what I should do with them. . . . [H]e said, 'Sell the whole thing and I will take that money and invest it for you, or advise you what to buy.' . . . [H]e knew that I was selling these [old stock] at a loss, because we discussed it; and I asked him if it would be wise to take such a loss, and he said, 'Yes, it would be wise, because I can make that up for you.' . . . A. And then I asked him about selling the funds, because it rather shocked me that he would suggest it. And I showed him the slip—or maybe more than one slip—concerning the funds, and he looked at it and acted as though he didn't—couldn't read it and couldn't figure it out, and he said, 'I just don't know much about mutual funds; I just don't handle that.' And he said—he tossed the slip back across the table to me, and he said, 'I can't discuss this; you will have to—if we are going to sell these funds, you will have to go over and sell them, and you will have to write back East, because I don't want to sell these for you.' . . .[H]e said he would take all this money that we would get from selling these securities and invest it for me, and advise me on what to buy, and that he would see that I would get a good, solid income and make more money."

Plaintiff asked defendant Nankin about his background, schooling and experience; it "seemed satisfactory" to her, and she let him advise her on what to do with the securities. Plaintiff told Nankin about what other funds she had, gave him a complete background of her financial condition, and showed him a copy of her tax return, but he "didn't seem too interested in all this."

Mrs. Twomey then sold her mutual funds as directed and brought the proceeds to Nankin. Plaintiff told him that the money she was turning over to him was "nonreplaceable" and that "he was to take them and to see that I would have a good income from them." Nankin said "he would like to do this. And he said, 'I will see that you have a good income from this money, and that also you will make some money.' " Nankin then showed Mrs. Twomey a list of stocks that he had prepared, Mrs. Twomey felt the list was all right. She did not know what happened to the list, but thought she put it back on his desk.

Either the next day or several days later, Nankin called plaintiff and said he had a stock he wanted her to buy. Plaintiff asked what it was, he told her, and plaintiff responded, "Well, I don't know what it is. If you think I should buy it, buy it. . . . You have charge of everything, and I wouldn't know what to do." After this transaction, Nankin started trading actively for plaintiff.

Nankin always called plaintiff before each purchase sale, and was in almost daily contact with plaintiff during the first six months of 1961. Without exception she followed his recommendations until some time in January 1962.

The foregoing facts clearly support a finding of confidential and fiduciary relationship within the principles of the authorities reviewed above in connection with the scope of the issues raised. The effect of other evidence on the nature and extent of the duties thereby created and the sufficiency of the evidence to show a breach of such duties is discussed below.

In finding "10," the court purported to set forth the particulars in which it found fraud and misrepresentation. ▇▇▇ The first is that the broker-dealer acted as principal in the sale and purchase of some securities without advising plaintiff of that fact. The record reflects that the broker-dealer as a member of underwriting syndicates made 11 sales to the customer; that it made 27 sales as principal from its inventory, and that it purchased from her as principal on 18 occasions. There is some evidence to indicate that the broker-dealer's profits on these transactions were greatly in excess of the commission which would be paid for a similar transaction on a stock exchange.

The plaintiff testified that she did not understand the nature of a principal transaction; and that Nankin did not tell her that his firm was acting as principal in some of the transactions. She acknowledged that she received confirmation slips for each of the transactions; that she tried to read them but could not always understand them; and that she could not remember any conversation with Nankin regarding principal or agency transactions. The confirmation slips were coded to show the manner in which the transaction was executed: "1-7 As Agent Through: . . ." [with "1" through "7" designating exchanges, etc.], "8—As Principal" and "9—Syndicate." Forms of confirmation slips of other brokers which were introduced in evidence reflect a more detailed explanation.

Defendants point out that there is nothing fraudulent per se in acting as principal in the sale or purchase of securities; that the confirmation forms comply with the requirements of section 11(d)(2) of the Act (15 U.S.C.A. § 78k(d)(2) and of rule 15cl-4 (fn. 4, *supra*), and disclose the capacity in which the broker-dealer acted; and that there is no evidence to show that the securities were bought or sold at a price not reasonably related to the current market price of the security as required by section 4 of the Rules of Fair Practice of the N.A.S.D., as interpreted by the Board of Governors of that association. (See generally Douglas & Bates, *Stock "Brokers" as Agents and Dealers* (1933) 43 Yale L.J. 46, 60-62.)

The question of whether the fiduciary has made a full disclosure, as required by law (see Civ. Code, § 2322, subd. 3; and §§ 2230, subd. 1 and 2233) is one of fact. The post-transaction confirmation which is not understood or brought to the customer's attention cannot excuse the failure to fully advise the customer before the transaction, where as here, the agent for all practical purposes controls the purchases and sales in the account. (See *Norris & Hirshberg* v. *Securities & Exchange Com.* (1949) 177 F.2d 228, 233, fn. 16 [85 App.D.C. 268] ; *Hughes* v. *Securities & Exchange Com.* (1949) 174 F.2d 969, 976, fn. 15 [85 App.D.C. 56].)

The evidence is sufficient to sustain the court's findings with respect to the failure of defendants to fully disclose that the broker-dealer was acting as principal in the transactions in question (see finding "10," *supra*). The significance of these findings may be misinterpreted. Plaintiff has not expressly sought recovery of the profits made by the defendants from these transactions, nor does she seek to rescind them. The facts found merely constitute a portion of the web of circumstances which plaintiff contends establish defendants' breach of duty. The fact that defendants made more in trading as principal and that they did so trade with the plaintiff, without full disclosure, tends to show an indifference to the fiduciary duty owed to a client whose funds they controlled. (*Norris & Hirshberg* v. *Securities & Exchange Com.*, *supra*, at p. 233; *Hughes* v. *Securities & Exchange Com.*, *supra*, at pp. 975-976; cf. *Charles Hughes & Co.* v. *Securities & Exchange Com.* (2d Cir. 1943) 139 F.2d 434 (cert. denied (1944) 321 U.S. 786 [88 L.Ed. 1077, 64 S.Ct. 781]).)

The second specific charge embodied in the findings is that there was excessive trading in the plaintiff's account.

Defendants object that this issue was not raised by pleadings or pretrial order. The latter, however, expressly sets forth that the manner in which the defendants handled plaintiff's account was at issue on the theories of negligence and fraud. The evidence shows that 161 transactions were concluded by the end of the first five months, May 31, 1961, and an additional 17 transactions were reported in the succeeding five months ending October 31, 1961. These 178 transactions were augmented by eight additional transactions which took place from December 1961 and through January 15, 1962.[7] Subsequent sales brought the total transactions to 190 before the account was closed in 1964. Because of sales or purchases in several lots, the actual aggregate of purchase and sale orders was 157.

Defendants acknowledge that the rules of the S.E.C. (rule 15c1-7(a) [17 C.F.R. 240.15c1-7(a)]), and of the New York Stock Exchange (rule 435, fn. 3, *supra*) interdict purchases and sales of securities in a discretionary account which are excessive in frequency in view of the financial resources and character of the account. In interpreting sections 1 and 2 of the Rules of Fair Practice, the N.A.S.D. has stated, "Excessive activity in a customer's account, often referred to as 'churning' or 'overtrading.' There are no specific standards to measure excessiveness of activity in customer accounts because this must be related to the objectives and financial situation of the customer involved." (See *Irish* v. *Securities & Exchange Com.* (9th Cir. 1966) 367 F.2d 637, 638; *Norris & Hirshberg, Inc.* v. *Securities & Exchange Com., supra*, 177 F.2d 228, 231-232; *R. H. Johnson & Co.* v. *Securities & Exchange Com.* (2d Cir. 1952) 198 F.2d 690, 692-693; *Lorenz* v. *Watson, supra*, 258 F.Supp. 724, 730-731 and 733; *McCollum* v. *Billings, supra*, 53 Misc.2d 661, 662-663 and 666-668 [279 N.Y.S.2d 609, 612 and 616-617]; *Lutz* v. *Boas* (1961) 39 Del.Ch. 585, 604-608 [171 A.2d 381, 393-395]; Note, *Churning by Securities Dealers, supra*, 80 Harv. L.Rev. 869, 869-879 and 882-886; Fishman, *Broker-Dealer Obligations to Customers—The NASD Suitability Rule* (1966) 51 Minn. L.Rev.

[7] Records prepared by Nankin indicate during the period January through May 1961, the trading recommended by him produced gains of $10,250.77 for plaintiff and generated commissions and profits on principal transactions (exclusive of profits on syndicate sales to plaintiff) of $7,242.38. During the balance of the year through January 3, 1962, sales which resulted in losses aggregating $3,219.19 were attended by commissions and profits, exclusive of syndicate gains, which totalled $1,092.84,

233, 241-243; Mundheim, *Professional Responsibilities of Broker Dealers, The Suitability Doctrine,* 1965 Duke L.J. 445, 471; Cohen and Rabin, *op. cit.,* 29 Law & Contemp. Prob. 691, 701; Fishman, *op. cit.,* 53 Ill. Bar J. 992, 1001; 3 Loss, Securities Regulation (2d ed. 1961) ch. 9D, pp. 1479-1480.)

Defendants claim that their obligation to plaintiff cannot be measured by the duties owing to a discretionary account because there was no written authorization for such an account as required by the rules of the New York Stock Exchange (rule 408, 2 C.C.H., New York Stock Exchange Guide, par. 2408), because the broker-dealer did not accept discretionary accounts, and because each transaction was authorized by a telephone conversation, and was confirmed in writing without objection by plaintiff. The findings that the partnership and the defendants were acting as financial advisors to plaintiff and that the plaintiff placed great trust and confidence in them and relied upon them (finding "7") is sustained by her testimony. The trial court was entitled to look at the substance and not the form of the transaction in determining the duty owed by defendants to plaintiff with respect to the frequency of the transactions in her account. (See *Norris & Hirshberg, Inc.* v. *Securities & Exchange Com., supra,* 177 F.2d 228, 231; *Lutz* v. *Boas, supra,* 39 Del.Ch. 585, 605-606 [171 A.2d 381, 394]; Note, *Churning by Securities Dealers, supra,* 80 Harv. L.Rev. 869, 871-874 and 882-883; Fishman, *op. cit,* 53 Ill. Bar J. 992, 1001; Mundheim, *op. cit.,* 1965 Duke L.J. 445, 471; Cohen & Rabin, *op. cit.,* 29 Law & Contemp. Prob. 691, 705-706; see Meyer, The Law of Stockbrokers and Stock Exchanges, Discretionary Accounts, § 62, pp. 306-310; and cf. *Carr* v. *Warner* (D.Mass. 1955) 137 F.Supp. 611, 614-615; and *Nash* v. *J. Arthur Warner & Co.* (D. Mass. 1955) 137 F.Supp. 615, 618.)

Defendants have furnished the court with a table purporting to show that "turnover" rate in the instant case is low as compared with the "turnover" rate in selected adjudications of the Securities Exchange Commission. The vice-president and assistant secretary of the broker-dealer, who was charged with the responsibility of supervising plaintiff's account, testified that the turnover did not reflect that the account was "churned" for the purpose of generating commissions for the broker, if it were considered in the light of an objective of trading to secure capital gains. There was no direct testimony to rebut this conclusion. The compensation generated for the

broker-dealer (see fn. 7, *supra*) indicates that the relationship was in any event a lucrative one for the broker and its representative. The propriety of the turnover in the account, however, appears to revolve about the question of whether it was proper to advise, encourage and execute such an objective for a customer with the plaintiff's resources and needs. On this basis the unsuitability of the securities selected for purchase colors the dealings between plaintiff and defendants, and supports the finding that "there was excessive trading in view of the plaintiff's financial position and in view of the size of plaintiff's account."

The foregoing conclusion is related to the third charge, to wit, "That the partnership and the defendants recommended and sold to plaintiff securities which were of a highly speculated [*sic*] nature with little prospect of income when they knew that the plaintiff was a widow and needed income and they knew that said securities were not adapted to her needs." (See *McCollum* v. *Billings, supra,* 53 Misc.2d 661, 666-667 [279 N.Y.S.2d 609, 616-617]; Fishman, *Broker-Dealer Obligations to Customers—The NASD Suitability Rule* (1966) 51 Minn. L.Rev. 233; Mundheim, *Professional Responsibilities of Broker-Dealers, The Suitability Doctrine,* 1965 Duke L.J. 445.) A security analyst, who testified for plaintiff, indicated that in his opinion, considering the financial condition of the plaintiff and considering the fact that she was a widow with a requirement for income, some 30 to 40 percent of the issues sold to her were of good quality for her account, while from 60 to 70 percent were of questionable quality. He felt that the majority of stocks sold to her would be suitable for "a businessman's risk type of account," where the person had another source of income and could assume some degree of risk.

The vice-president and assistant secretary of defendant testified that the stocks his company sold to plaintiff might be considered as "generally speculative." He further indicated that it was his feeling that the recommendation of speculative, low-priced securities to customers without knowledge or an attempt to obtain information concerning their other security holdings and their financial situation, would be a questionable practice. He felt that it would be helpful in advising a customer to know about the customer's other assets, but that generally people were reluctant to divulge such information. It was his opinion that in advising a widow on her invest-

ments, her age, her capacity for working, her health, and her expectations in terms of investing in stock should be considered.

It appears that neither Nankin nor the supervising officer made any effort to learn the essential facts as to plaintiff's financial situation and needs (see fns. 2 and 4, *supra*). In this connection reference was made to a policy of not recommending sales of mutual funds within six months of their purchase, not to show that the rule had been violated (it had not), but to show defendants' indifference, perhaps studied, by Nankin's failure to ascertain the period for which the customer had held these securities. It is contended that the sole obligation of the broker-dealer is to carry out the stated objectives of the customer. This may well be true when the broker is acting merely as agent to carry out purchases or sales selected by the customer, with or without the broker's recommendation. Here, however, there is evidence to sustain the finding that Nankin's recommendations, as invariably followed, were for all practical purposes the controlling factor in the transactions. Under these circumstances, there should be an obligation to determine the customer's actual financial situation and needs. (Mundheim, *op. cit.*, 1965 Duke L.J. 445, 472-476; Fishman, *op. cit.*, 51 Minn. L.Rev. 233, 248; and see Comment, *Brokerage Firm's Liability for Salesman's Fraudulent Practices* (1967) 36 Fordham L.Rev. 95; *Lorenz* v. *Watson, supra,* 258 F.Supp. 724, 733; Note, *Churning by Securities Dealers, supra,* 80 Harv. L.Rev. 869, 881.) If, as appears from the evidence and as found by the court, it was improper for her to carry out the speculative objectives which defendants attribute to her (but which her testimony does not fully admit), there was a further obligation to make this known to her, and refrain from acting except upon her express orders. (See Fishman, *op. cit.*, 51 Minn. L.Rev. 233, 248; Mundheim, *op. cit.*, 1965 Duke L.J. 445, 476; and see *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Bocock* (D.Tex. 1965) 247 F.Supp. 373, 380.)

The court further found: "That the partnership and the defendant Nankin told the plaintiff that monthly funds they sent to her for a period of time were profits from their handling of her account whereas in truth only a portion of said funds were realized from profits made in the handling of her account and the rest of the money was realized from the sale of plaintiff's assets." This finding is apparently predicated

upon a discrepancy between the face amount of checks which Nankin said he computed as being profits and ordered sent to plaintiff, and the monthly profits as computed by Nankin at the time of trial from the monthly statements sent to plaintiff. The evidence shows that over the first five months the sum of the checks, and presumably the profits shown in Nankin's statements which accompanied them, did not exceed the sum of the profits and dividends. It is possible that the finding might be sustained for "a period of time"—i.e., one month, but in any event the record does not sustain a conclusion that profits were exaggerated to plaintiff, or that an attempt was made to imply exaggerated profits by returning to her her capital. Subsequently, however, there were sales and an acknowledged return of capital to her in response to her requests for funds.

The finding that unlisted stocks were purchased and sold for plaintiff's account is sustained by the evidence, but is of questionable significance. Insofar as it suggests a breach of duty by defendants it is encompassed in the suitability finding, but as defendants point out there may be many unlisted securities which are suitable for a nontrading investment account.

■■■ The trial court was warranted in finding that the defendants acted improperly, fraudulently, in breach of the fiduciary relationship, and negligently, in the performance of their fiduciary duties in handling plaintiff's investment account. Plaintiff's evidence establishes that defendants took over for her account the management and control of the funds and securities entrusted to them. Under these circumstances they owed her a duty to ascertain her financial situation and needs. They neglected to do so, and engaged in a course of trading which was excessive in frequency and unsuitable in quality for one in the situation of plaintiff.

The controversy in this case is paralleled by the examples given by *Mundheim* of the "greedy old lady" posing as the "sweet trusting widow." (See Mundheim, *op. cit.*, 1965 Duke L.J. 445 at pp. 464-466 and 475-476.) His proposed guidelines are adopted here as a standard of conduct for a broker-dealer who undertakes to control the customer's account. He states: "One situation with which the guideline should deal is the case mentioned earlier involving the 'sweet trusting widow' who turns out to be a 'greedy old lady.' Typically, the 'sweet trusting widow' has opened an account with an investment

objective ·stressing conservation of capital and stability of income. At some point—and for various reasons—she asks for recommendations of a ·speculative nature which will permit her to become rich quickly. At first glance, it may seem that no suitability problem arises if the securities recommended meet the new investment objective. However, the literal wording of the NASD's suitability rule suggests, as does the concept of risk threshold, that the broker-dealer cannot, without more, act on her announced change in investment objective. The problem is similar to that which occurs when a customer opens an account and the broker-dealer helps him to decide on the proper investment objective. Here the broker-dealer's responsibility to help the widow is even stronger because of the established relationship between them. Thus, the guideline should state that the broker-dealer must assume the responsibility for ascertaining that the widow understands the investment risks involved in her changed objective. These risks should be explained by the broker-dealer in the light of her financial situation as known to him. The conversation between the broker-dealer and the widow may result in: (1) The widow's return to her old investment objectives. In this case she would not purchase any of the speculative securities she initially demanded. (2) The widow's adherence to her changed investment objective with the broker-dealer persuaded that she is able to bear the risks inherent in the new investment objective. In this case he should be permitted to recommend those speculative securities which he thinks are appropriate. (3) The widow's adherence to her changed investment objective without, however, the broker-dealer being persuaded that she is able to bear the risks inherent in the new investment objective. In this case the broker-dealer should be required to inform the customer that no speculative securities are suitable for her. If, nevertheless, she insists on purchasing such securities, the broker-dealer should be allowed to advise her about various speculative securities and purchase for her the ones which she selects. However, he should not, as long as he thinks that the securities are beyond her risk threshold, be permitted to solicit her purchase of any such speculative securities.''

It may be asserted that the proposed guidelines are merely ethical standards and should not be a predicate for civil liability. Good ethics should not be ignored by the law. It would be inconsistent to suggest that a person should be defrocked

as a member of his calling, and yet not be liable for the injury which resulted from his acts or omissions.

Defendants point to other evidence which they contend compels a contrary conclusion. Plaintiff acknowledged that she understood that there was a risk, that she knew securities could go down as well as up, and that she understood that defendants were not going to make good her losses, or guarantee her a profit. This, however, is not to say that she was competent to evaluate the extent of the risk she was taking or the propriety of one of her financial condition so doing. The fact that she had inherited money, that she had prior transactions with other brokers, and that she had improvidently invested in one speculative security on her own initiative might justify a finding of knowledgeableness and lack of reliance, but they do not compel that result when taken with her other testimony. The receipt of confirmation slips and accounts, and her ability to chart the cost and prices of her securities are facts of the same tenor. They may permit, but they do not compel, findings that plaintiff knew she was engaged in a course of trading and purchasing securities of a type that were unsuitable for one of her financial situation and needs. The daily calls from Nankin only have significance if she was exercising some judgment herself. The trial court concluded to the contrary that she was relying on his judgment.

### The sufficiency of the findings

The court further found: "12. That the plaintiff take nothing by reason of the First Cause of Action, Second Cause of Action or Third Cause of Action of her Complaint on grounds of failure of proof." Defendants apparently assume that this finding necessarily implies that all of the allegations of the first three causes of action fall for failure of proof. This is not necessarily so. The finding ("4," *supra*) that "Nankin and the partnership orally agreed with plaintiff to consult with her and to advise her in connection with her investments" is sustained by plaintiff's testimony. The court failed to find: "That in said agreement defendants stated that they would invest her funds so that the value of the same would increase and that plaintiff would also receive an income larger than she was receiving from said securities plaintiff had prior to said date." This allegation was the meat of the first cause of action for breach of contract. The failure to prove that obligation does not impugn the finding which was made concerning

the actual agreement. Nor is the actual agreement affected by the failure to prove the oral warranty, of similar tenor to the unproved obligation, as set forth in the second cause of action, or the implied warranty of professional competency set forth in the third cause of action.

The findings with respect to confidential and fiduciary capacity as set forth in findings, "7" and "9," and the findings of fraud in finding "10," have all been reviewed above. The failure to find an express agreement of the nature of that set forth in the first cause of action, or an express or implied warranty, as set forth in the succeeding causes of action, does not indicate that the defendants could not be charged with other obligations by reason of the relationship entered into with plaintiff.

■ Defendants further list 12 issues and contend that the trial court committed prejudicial error in failing to make special findings as requested by them in objections and in requests lodged with that court. (See Code Civ. Proc., § 634; *Garber* v. *City of Los Angeles* (1964) 226 Cal.App.2d 349, 354-356 [38 Cal.Rptr. 157]; and *Callaway* v. *Downie* (1961) 195 Cal.App.2d 348, 352-353 [15 Cal.Rptr. 747].)

An examination of the issues propounded in the light of the findings actually made indicates that they are governed by the following passage from *Coleman Engineering Co.* v. *North American Aviation, Inc.* (1966) 65 Cal.2d 396, 410 [55 Cal. Rptr. 1, 420 P.2d 713]: "We have examined the findings of the trial court in the light of the criticism made in defendant's brief and are satisfied that the findings sufficiently dispose of all of the basic issues raised. The findings proposed by defendant, insofar as they may be deemed additional findings and are not directly contrary to the findings made, deal with evidentiary matters and, even if the matters therein were found in favor of defendant, would not require judgment in its favor. Section 634 of the Code of Civil Procedure does not require that a finding be made as to every minute matter on which evidence is received at the trial, and under the circumstances the refusal of the court to make specific findings on every matter proposed in defendant's counter-findings does not require a reversal of the judgment."

*Limitations and laches*

■ The action was filed December 8, 1964. The court found that the partnership and the defendants continued to consult with and advise plaintiff from January 1961 until she

closed her account in July 1964 (finding "4," *supra*; and see findings "7," "9" and "10"). More particularly it recited: "14. That the defendants told the plaintiff repeatedly from January 1961 up to the time she closed her account in July 1964 that her investments were good and that she would not suffer loss as a result of her investments made through the recommendations of the partnership and the defendants." It further found that the fourth cause of action, predicated upon negligence, was not barred by the provisions of subdivision 3 of section 338 of the Code of Civil Procedure, and that the fifth cause of action, predicated upon fraud was not barred by the provisions of subdivision 4 of that section.[8]

In their answer and in the pretrial order, defendants set up the defense of the statute of limitations, predicated upon the foregoing sections, with respect to the fourth and fifth causes of action. They similarly asserted that the first three causes of action were barred by the two-year provision of subdivision 1 of section 339 of the Code of Civil Procedure.[9] They now seek to apply the two-year provision to any right of action predicated upon the defendants' carelessness and negligence (see finding "9," *supra*). It is questionable whether the two-year limitation may be asserted because the defendants failed to plead that section in answer to the fourth and fifth causes of action. (See Code Civ. Proc., § 458; *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 374-375 [28 Cal.Rptr. 357]; but cf. *Tofte* v. *Tofte* (1936) 12 Cal.App.2d 111, 113-114 [54 P.2d 1137]; and see *Davenport* v. *Stratton* (1944) 24 Cal.2d 232, 245-253 [149 P.2d 4]; and *Corrigan* v. *Stiltz* (1965) 233 Cal.App.2d 381, 385-386 [43 Cal.Rptr. 548], with respect to the effect of claimant's failure to object when the defendant neglects to state the proper subdivision.)

By analogy to the stockholder's right of action against a director for the latter's negligence, it may be concluded that the proper limitation period is the two-year period of subdivision 1 of section 339. (*Burt* v. *Irvine Co.* (1965) 237 Cal.App. 2d 828, 865 [47 Cal.Rptr. 392]. See also *Bustamente* v. *Haet,*

---

[8]Code of Civil Procedure section 338 provides in part: "Within three years: . . . 3. An action for taking, detaining, or injuring any goods, or chattels, including actions for the specific recovery of personal property. 4. An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake. . . ."

[9]Code of Civil Procedure, section 339 provides in part: "Within two years. 1. An action upon a contract, obligation or liability not founded upon an instrument of writing. . . ."

*supra,* 222 Cal.App.2d 413, 414 [35 Cal.Rptr. 176]; and *Griffith* v. *Zavlaris* (1963) 215 Cal.App.2d 826, 828 [30 Cal.Rptr. 517], which apply section 339 to actions to recover for attorney's malpractice.) [10] Defendants contend that the two-year period inflexibly commences at the time of the alleged negligent act or omission and that, therefore, any recovery for any alleged misfeasance which occurred prior to December 8, 1962 is barred.

There is authority, however, for the proposition that where the victim is unaware of the negligence of an agent or one acting in a fiduciary relationship, the commencement of the running of the statutory period is suspended until either the relationship is terminated or there is discovery or grounds for discovery of the negligent breach of duty. In *Moonie* v. *Lynch* (1967) 256 Cal.App.2d 361 [64 Cal.Rptr. 55], the question was stated as follows: "Does the statute of limitations in an action for alleged malpractice by an accountant start to run from the alleged negligent act, from discovery of the negligence, or from the date when defendant was notified of the income tax penalty assessment?" The court summarized the law as follows: "The statute in physician malpractice cases does not begin to run until discovery of the injury. (*Huysman* v. *Kirsch* (1936) 6 Cal.2d 302 [57 P.2d 908]. In attorneys' malpractice cases the statute commences to run when the negligent act occurs. (*Griffith* v. *Zavlaris* (1963) 215 Cal. App.2d 826 [30 Cal.Rptr. 517].) In insurance agent malpractice the statute does not start to run until a judgment against the intended insured which the neglected insurance was intended to cover has been obtained. (*Walker* v. *Pacific Indem. Co.* (1960) 183 Cal.App.2d 513 [6 Cal.Rptr. 924].) " (*Id.,* p. 363.) After reviewing other authorities it concluded: ". . . we see no reason to apply 'harsh' rule of the attorney's malpractice cases to this case. The circumstances of

---

[10]Section 29(b) of the Securities Exchange Act (15 U.S.C.A. § 78cc (b)) requires that any action to enforce liability under section 15(c)1 of the Act (15 U.S.C.A. § 78o(c)(1)), which is directed at brokers and dealers practices with respect to purchases and sales of unlisted securities, be commenced within one year of the discovery of the violation and no later than three years after such violation. (See *Lorenz* v. *Watson* (D.Pa. 1966) 258 F.Supp. 724, 733-734.) This section was not pleaded or urged in this case. It is unnecessary in this case to determine whether it could be asserted in action on common law grounds for fraud or negligence, on the theory that the alleged delict is also cognizable under the Act. (See *Hecht* v. *Harris Upham & Co.* (D.Cal. 1968) 283 F.Supp. 417, 430-431 [Civil No. 44137, January 22, 1968, mss. at pp. 37-38].)

this case (assuming that the allegations of the cross-complaint are true and that defendant filed this action within two years of the discovery of the alleged negligence, or the time when with reasonable diligence he should have discovered it) cry aloud for a rule which would not have required defendant to have brought his action in a period before he could have, known that plaintiff had been negligent and that he, the defendant, had been injured. We, therefore, hold that in a malpractice action against an accountant the statute of limitations does not run until the negligent act is discovered, or with reasonable diligence could have been discovered.'' (*Id.,* pp. 365-366. See also Note (1957) 15 U.C.L.A. L.Rev. 230.)

The continuing duty of the agent to perform has even been recognized in legal malpractice cases. (See *Chavez* v. *Carter,* 256 Cal.App.2d 577, 581 [64 Cal.Rptr. 350]; *Fazio* v. *Hayhurst,* 247 Cal.App.2d 200, 209 [55 Cal.Rptr. 370]; and *Shelly* v. *Hansen,* 244 Cal.App.2d 210, 213 and 215 [53 Cal.Rptr. 20]. See also *Vai* v. *Bank of America, supra,* 56 Cal.2d 329, 338; and *Abrams* v. *Bendat, supra,* 165 Cal.App.2d 89, 95.) In this case there was a continuing obligation on the broker not only to avoid churning plaintiff's account, but to invest her funds in suitable securities.

In *Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528 [25 Cal.Rptr. 65, 375 P.2d 33], the plaintiff sought recovery for a title company's failure to discharge a tax liability as instructed in an escrow. Sixteen months after close of escrow a lien was filed against the property purchased, and suit was not commenced against the title company until more than two years after the close of escrow. The court reversed a judgment for the title company and sustained both of plaintiff's alternative contentions: that the four-year statute of limitations applied because the contract was in writing, and that the two-year statute, if applicable, did not commence to run until plaintiff discovered the breach of duty. The opinion states: ''Cases in which the defendant stands in a fiduciary relationship to the plaintiff are frequently treated as if they involved fraudulent concealment of the cause of action by the defendant. The theory is that although the defendant makes no active misrepresentation, this element 'is supplied by an affirmative obligation to make full disclosure, and the nondisclosure itself is ''fraud.'' ' [Citations.] There is no need to resort to this fiction, however, for the very existence of a fiduciary relationship obviated the necessity of plaintiff's pleading fraud. [Citations.] If, as plaintiff alleged, defendant

breached its fiduciary duty to disclose her potential liability for the unpaid sales taxes, it would be manifestly unjust to hold that her action was barred by the statute of limitations when her failure to file a timely complaint resulted from that breach.'' (58 Cal.2d at pp. 534-535.)

Defendants do not question the application of the three-year provision of subdivision 4 of section 338 to the charges predicated on fraud, but they attack the findings and insist that plaintiff should have discovered any misfeasance prior to December 8, 1961.

In support of the position that the two-year statute bars plaintiff's cause of action for negligence, defendants point out that the regular trading for plaintiff's account terminated with a purchase January 18, 1962; that after that date there were only four sales made for her account; and that these sales were made on plaintiff's initiative and her request because she needed money. It is not contended by plaintiff that under the circumstances the defendants were negligent in selecting the particular stocks to be sold on these occasions. The gravamen of her complaint is that by virtue of the churning and the purchase of unsuitable stocks she was left with an improper portfolio at the time Nankin stopped active trading in January 1962. The question is when she should have discovered this fact, and this issue may be considered after mention of defendants' position with respect to the three-year statute.

Defendants select October 31, 1961 as the terminal date for any acts or omissions giving rise to a claim of fraud, because 168 of the 191 transactions in 1961 occurred prior to that date. They point out that following five good months in which gains of over $10,000 were realized for plaintiff, there were nine sales in the period from June through October of which seven were at a loss, and two were for gains of only $124.79. They conclude that on this record, plaintiff should have realized by October 31, 1961 that her capital would not increase, and that her income would not be greater.

· Plaintiff testified she stopped trading actively because defendant told her to ''sit tight''—at a time when all stocks were down and nothing could be done—late in 1962. (According to Nankin, he stopped trading because she stated she did not want to take any more losses—a statement she qualifiedly admitted as making in acquiescing with his advice.) After this plaintiff would call the defendant from time to time and

he would tell her, " 'Don't do anything.. Just. sit tight and things will be all right.' He said, 'I am not selling any of my holdings, and I am just sitting tight. You do the same.' " "And then he would say he was going to a meeting—or that he had heard that something was going to go on in the company and it would be good for my stock, and to wait. And then at one time he said that he understood that Chemplate was going to paint the wheels, I believe with this—whatever it is they use—and that then my stock would go up and I would be all right."

Plaintiff last spoke to defendant in 1964. She said she was going to come down and bring all her material, to talk with him, and he told her not to come. At this point Mrs. Twomey sought legal advice. Mrs. Twomey denied, as stated by Nankin, that she ever told defendant she would no longer take losses on her stocks. She had taken losses from the first month of trading.

Her testimony supports the findings that "the defendants continued to consult with and advise plaintiff in connection with her [account] until plaintiff closed her account with the defendants in July of 1964" (finding "4"), and that during that period "the partnership and the defendants were acting as investment advisers to plaintiff and plaintiff placed great trust and confidence in the defendants and in the partnership and relied upon them" (finding "7"), and also finding "14" as quoted above. Defendants emphasize the fact that Nankin ceased making recommendations and active trading in the account in January 1962. From all that appears, a falling market made trading more hazardous and impractical. The relationship was not terminated and according to plaintiff's testimony she took Nankin's advice to not sell as she had previously accepted his recommendations to buy and sell. In any event, by January the horse was out of the barn. The question of whether plaintiff should have discovered her loss and how the barn door was opened was one of fact, and the trial court resolved it against defendants. (See *Burt* v. *Irvine Co., supra,* 237 Cal.App.2d 828, 864-866; *Kruse* v. *Miller, supra,* 143 Cal.App.2d 656, 660 [300 P.2d 855, 61 A.L.R.2d 1213]; *Alton* v. *Rogers* (1954) 127 Cal.App.2d 667, 679-680 [274 P.2d 487].) In the case last cited, as in this case, money was entrusted to an agent to invest. The defalcation was a more serious and complete breach of duty than the acts and omissions charged in this case, but the principles laid down by the

court are equally applicable. The opinion states: ". . . the first cause of action is not concerned with fraud. It involves an oral, voluntary and continuing trust. This trust continued until it was repudiated by defendant, and until plaintiff learned of such repudiation." (P. 679.) "While it is true that plaintiff knew that defendant was not fulfilling the promises made in 1941, defendant's continuing reassurances and optimism, in legal effect, amounted to a renewal of the original promises. The trust, under the evidence, was a continuous one. The finding of the trial court on this issue is supported by the record and by the law. Substantially this same reasoning is applicable to the fraud cause of action. In view of the confidential relationship that existed between the parties plaintiff was legally entitled to rely on the many reassurances of defendant that everything was all right, and this legitimately delayed the discovery of the fraud." (Pp. 679-680.)

 Defendants further assert that plaintiff's right to recover is barred by her ratification of the transaction and by her laches. They rely on the doctrine that an allegedly defrauded customer cannot stand by and speculate on the market, ratifying the transaction if it is to his advantage, and disaffirming it if it produces a loss. (See *Griffin* v. *Payne* (1933) 133 Cal.App. 363, 373-374 [24 P.2d 370] ; *Carr* v. *Warner, supra,* 137 F.Supp. 611, 615; and *Nash* v. *J. Arthur Warner, supra,* 137 F.Supp. 615, 618.) The application of this principle presupposes that the victim knows of his right to disaffirm. The evidence shows that by phone conversations, confirmation slips and monthly accounts, plaintiff was apprised of what was being done in her account; and that she was able to keep her own records of these transactions. This quantitative appreciation of the disposition being made of her resources might justify, but it does not compel, a finding that she was aware of the lack of suitability of her investments, or of the impropriety of the manner in which her account was being handled. The evidence supports the conclusion, inherent in the court's findings, that she was unaware of the qualitative nature of the transactions recommended by her advisor. The court properly found: "13. That the plaintiff was not guilty of contributory negligence."

It is concluded that plaintiff's right to recover was not barred by limitation, laches, or ratification.

*Damages*

 The court computed plaintiff's damages as follows:

"Value of securities at the time they were sold or turned over to Defendant Nankin and the partnership $52,668.00

Amount which would have been earned by said securities from January 1961 to July 1964 inclusive 10,206.00

Total $62,874.00

From which amount should be subtracted

Value of securities returned to plaintiff as of July 15, 1964 $14.843.25

Cash paid to plaintiff from January 1961 to July 15, 1964 including profits from sales and dividends $15,674.04

Total $30,517.29

Plaintiff is entitled to receive as damages the difference between $62,874.00 and $30,517.29 or the sum of $32,356.71."

Defendants attack the computation of damages on the grounds that both the sum of $10,206 allowed for assumed earnings, and the balance of the amount awarded are without support in the evidence, and cannot be justified as a matter of law.

Testimony was introduced to substantiate each of the foregoing figures. The $10,206 represented the total dividends, both regular and capital gains, that would have been received by one holding the securities, which the plaintiff sold and surrendered in January 1961, for the period from January 1961 to July 1, 1964. The accuracy of the figures is not questioned, so the dispute resolves itself into whether the court's computation is a proper legal measure of damages.

Defendants object to the allowance of reconstructed earnings because they are entirely conjectural in view of the fact that plaintiff was dissatisfied with her portfolio and seeking to change her investments. This conclusion overlooks the fact that the gravamen of this case is that the defendants negligently and in breach of their fiduciary duty advised plaintiff to switch into unsuitable investments and engage in excessive transactions. The fact that she might have done worse if left to her own devices cannot justify the defendants' improper handling of her account. No one can say now what she might have done with proper advice. She might have retained the

securities she owned, or might have made investments which were more productive.

Defendants further object to the totality of the award because it appears to give damages for fraud, as provided by Civil Code section 3343.[11] Actually section 3343 might preclude recovery if what was received in return for what plaintiff surrendered is evaluated as of January 1961. In *Walsh* v. *Hooker & Fay, supra,* 212 Cal.App.2d 450, the question was reviewed and the court concluded that where a fiduciary relationship existed, as between broker and customer, the true measure is that provided in Civil Code section 3333[12] which permits recovery for all the detriment suffered. (212 Cal.App. 2d at pp. 458-462.) In *Weiner* v. *Mullaney* (1943) 59 Cal. App.2d 620 [140 P.2d 704], where a brother speculated with his sister's inheritance in violation of his duty as her agent, an award of the difference between the price received for her inherited shares which were wrongfully sold, and the value of the stock and cash ultimately recovered by the sister was held proper. (See 59 Cal.App.2d at pp. 635-636 and 638-639; and Civ. Code, §§ 2322, subd. 3; 2237 and 2238.)

The defendants claim that there is no warrant for taking the value of the returned securities as of the time the account was closed, and they suggest the dates at which they urge plaintiff should have discovered defendants' misfeasance, October 31, 1961, and at which active trading ceased, January 31, 1962. The date selected is the date which the court found, on the evidence, that the fiduciary relationship and the reliance terminated. There was no duty on plaintiff to mitigate damages before that date. Defendants who were in control of the account were free to act toward that end at any time during their relationship with plaintiff.

Defendants claim that the loss is too conjectural and speculative because it must in part be attributed to a volatile and fluctuating securities market. Insofar as a loss was so occa-

---

[11]Civil Code section 3343 provides in part: ''One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.''

[12]Civil Code section 3333 provides: ''For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.''

sioned there might be some merit in defendants' contention. The evidence reflects, however, that the securities surrenderd and sold would have had a value in July 1964, after the $10,206 in distributions, of $9,061 more than at the time they were surrendered.[13] It may be inferred that the portfolio selected by defendants did not do as well because it was unsuitable for the customer's needs, and not because of market fluctuations.

Defendants suggest that the damages for churning should be limited to the commissions earned, because it cannot be determined what effect market conditions had on the losses. (See *Newkirk* v. *Hayden, Stone & Co.* (D.Cal. 1965) [C.C.H. Fed. See L.Rptr., par. 91.621] ; *Hecht* v. *Harris, Upham & Co., supra,* 283 F.Supp. 417, 440 [No. 44137 (Civil) January 22, 1968, mss., pp. 35-36].) In this case the churning is merely a manifestation of the general negligence and breach of fiduciary duty which left the plaintiff with unsuitable securities. It has been pointed out that the amount of the commissions may have no relationship to the amount of the losses suffered by the customer. (Note, *Churning by Securities Dealers, op. cit.,* 883-884.) The author of the cited note also discusses out-of-pocket recovery, and loss of the bargain recovery, as being other possible measures of damages (*id.,* pp. 884-885). The most rational approach in a case of this nature may well be a comparison of the actual experience with a theoretical properly managed account. There is no evidence on this point in this case.

Defendants, however, are in no position to object to the out-of-pocket rule adopted by the court. The minuend accurately sets forth the sum entrusted to defendants. The evidence reflects that it would have enhanced in value if it had been retained in the form in which it was held by plaintiff at the time the defendants took over her account. There is no evidence to show that an otherwise properly managed account for a customer of the nature of plaintiff would have ultimately depreciated in value over the period involved. The other factor in the minuend is the computed earnings on the sold and surrendered securities. There is no evidence to show

---

[13]This element of computable theoretical loss was not included in the damages. If there had been a drop in the value of the customer's original portfolio, or evidence to show a drop in what would have been a proper portfolio for the type of customer involved, there would be some merit in attributing part of the loss to market conditions.

that they are other than what would have been yielded by a properly selected and managed account. On that record the court properly took the sum as the amount which plaintiff should have received over the period involved.

The subtrahend gives the defendants their due. It is true that all of the securities they selected were not unsuitable. It may be inferred, however, in the absence of evidence to the contrary, that those securities which were suitable kept pace with the securities surrendered and sold by plaintiff, and that they thereby lessened plaintiff's ultimate loss, which may be attributed to the unsuitable securities. The defendants not only were given credit for the gains which they realized and paid out to plaintiff in the early stages of managing her account, but also were permitted to retain the commissions and profits they received from what was found to be excessive trading.[14]

One cause for complaint does appear. After January 1962, on two occasions, sales were made at plaintiff's request to meet her financial needs. The first May 29, 1962, produced a loss of $2,040.36, the second in July 1963, a net loss of $614.11. Defendants not having recommended these sales, may say that proper management, given the then existing portfolio, would dictate "sitting tight." There was no attempt to show whether the securities which were the subject of these sales appreciated or depreciated in value between the date of their sale and the date of the termination of the account. The failure of the defendants, as a fiduciary, to come forward with evidence to qualify the established loss precludes any relief at this stage of the proceedings.

No prejudicial error is found in the manner in which the damages were established.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied June 27, 1968, and appellants' petition for a hearing by the Supreme Court was denied July 31, 1968.

---

[14]In view of the measure of damages used it may be proper to permit the agent to retain his compensation. (See *Tackett* v. *Croonquist* (1966) 244 Cal.App.2d 572, 576-578 [53 Cal.Rptr. 388].)