**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellant,**

v.

**Emby A. McKEEHAN, Appellee.**

Court of Appeals of Kentucky.

April 28, 1978.

Discretionary Review Denied Oct. 3, 1978.

Dennis A. Bradley, Bradley & Emerson, Lexington, for appellant.

Thor H. Bahrman, Corbin, for appellee.

Before COOPER, HOWARD and WILHOIT, JJ.

HOWARD, Judge.

This is an appeal from the Whitley Circuit Court concerning a margin account in the Commodities Market opened by defendant-appellee, Emby A. McKeehan (hereinafter referred to as McKeehan), through plaintiff-appellant, Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter referred to as Merrill Lynch).

Two actions were filed in the court below and consolidated. The complaint filed by McKeehan, alleging fraud and demanding judgment for the amount of money which he had invested in the margin account with Merrill Lynch, was dismissed. The complaint filed by Merrill Lynch, demanding the amount of money lost by it when it was forced to liquidate McKeehan's account when he failed to meet his margin calls, was likewise dismissed. Merrill Lynch appeals from the judgment of the trial court dismissing its complaint.

The issue on appeal, as stated by both parties, is whether an instruction indicating that a customer "does not want his account to go into the red" constitutes a continuing stop-loss order, precluding a brokerage firm from recovering losses sustained by the customer.

McKeehan began trading in the Commodities Market through an account established in the Louisville office of Merrill Lynch. After a telephone interview with a Lexington account executive, Mark Cardoza (hereinafter referred to as Cardoza), McKeehan transferred the balance of his account ($1,859.02) from the Louisville office to the Lexington office. McKeehan transferred

another $1400.00 into the account and began trading in the Commodities Market through the Lexington office in November, 1972. On December 8, 1972, McKeehan opened another margin account in the Commodities Market with a deposit of $1000.00. He continued trading over the month of December, realizing several small profits and losses.

In December, 1972, McKeehan sold short contracts of pork bellies and soybeans, expecting to realize profits, when these contracts dropped from their near record highs. The Commodities Market, however, continued to reach record highs in prices, and McKeehan suffered continuing losses.

On January 15, 1973, a margin call was issued to McKeehan requesting more funds. No additional funds were advanced. On January 18, 1973, another margin call was issued, to which McKeehan also did not respond. The account was subsequently liquidated with the resultant losses which are the subject of this action.

A "short" sale is a sale of a commodity which the seller does not at that time possess, but by the date agreed upon in the future for delivery to the purchaser, the seller will have acquired for the purpose of such delivery. 12 Am.Jur.2d *Brokers* § 116.

A stop order is a direction given by the customer to a broker that, if the commodity touches the price named in the direction while it is being held, the broker shall then sell the commodity at the best available price. It is a measure of protection for the customer so that he can provide himself against loss in a fluctuating market. A definite price is not necessary; the price may be described by referring to conditions and contingencies. 12 Am.Jur.2d *Brokers* § 129 and note cases cited therein.

There appears to be no conflict between the parties that McKeehan made the general statement, while discussing his trading objectives in the Commodities Market with Cardoza, that he did not wish his account to go into the "red". The trial court interpreted that statement as a broad stop-loss order to be executed by Merrill Lynch, even though this statement was made prior to the institution of any trades by McKeehan, therefore lacking specificity as to any particular commodity or market price.

McKeehan, in his brief to this Court, states that the real problem results from the fact that Merrill Lynch decided he had a trade capacity of some twenty thousand dollars (brokerage firms use a figure for trade capacity of 10% of an individual's net worth). Cardoza received the information on McKeehan's net worth and net income from McKeehan himself. McKeehan also alleges that the trades were not suited to his investment account and that the only possible reason for these trades was to increase the commissions due Merrill Lynch and Cardoza.

McKeehan attempts to equate his position, in that respect, with the defrauded widow in *Twomey v. Mitchum, Jones & Templeton, Incorporated*, 262 Cal.App.2d 690, 69 Cal.Rptr. 222 (1968). We have read the applicable portions of the rather lengthy *Twomey* case, and the actions by the stockbrokers therein were found to be fraudulent, entitling the widow to recover the money she had invested with them. The trial court, in the instant case, held the McKeehan could not recover on the fraud theory alleged in his complaint, and with this we agree.

McKeehan argues that he was relying on the expertise of Merrill Lynch and that Merrill Lynch engaged in trading not suited to his financial resources. McKeehan was aware of the volatility of the Commodities Market and trading therein; he testified that he had suffered a loss while trading in commodities through the Louisville office of Merrill Lynch. Although the recommendations as to commodities and prices came to him from Cardoza, McKeehan made the final decision as to buying and selling.

McKeehan also testified that he didn't know exactly the workings of a margin account or what trading in the Commodities Market entailed. He was knowledgeable, however, as this portion of the trial testimony indicates, as to how he wanted the soybean account handled.

Q. 139 In both of these letters you were advised that your account needed additional funds in order to maintain any position in the market, isn't that correct?

A. That's correct.

Q. 140 In response to these letters and telephone calls that were made, what did you do?

A. I explained to Mr. Cardoza that he should let me go long on a spread, that is, buy back soybeans at another date in order that I could parlay it against my losses.

. . . . .

Q. 146 Did you follow their advice each time they gave it to you?

A. Except to close out after I had gone in the hole.

Certainly, McKeehan did not want his margin account to go into the "red"—what person who plays the stock market would? But there is testimony by Cardoza and testimony by McKeehan himself that indicates McKeehan did not want to change his position on the soybean contract so as to result in a smaller loss.

In *Twomey, supra,* at 69 Cal.Rptr. 222, 248, the court mentions the doctrine that an ". . . allegedly defrauded customer cannot stand by and speculate on the market, ratifying the transaction if it is to his advantage, and disaffirming it if it produces a loss."

 We believe McKeehan was speculating, and that the general statement, about his account not going into the red, did not allow him to continue to hold his position on the soybean contract, and thereafter place the loss of this speculation on Merrill Lynch. The finding by the trial court that McKeehan's statement constituted a broad stop-loss order is clearly erroneous and is therefore set aside. CR 52.01.

The judgment of the trial court is reversed and remanded with directions to the trial court to enter judgment in favor or Merrill Lynch as demanded in its complaint.

WILHOIT, J., concurs.

COOPER, J., dissents.

COOPER, Judge, dissenting.

As a condition of their original bargain, appellant, hereinafter referred to as brokerage house, and appellee, hereinafter referred to as McKeehan, agreed that McKeehan's trading account was not to go into the red, i. e., a deficit situation requiring additional funds to be submitted by McKeehan. If the brokerage house was prohibited by rule or regulation, or was otherwise unable to live up to such a condition, it should have advised McKeehan initially that such a condition was not acceptable. It did not.

Additionally, after the first margin call (if not before, pursuant to their agreement) the brokerage house had the right to liquidate McKeehan's account. The brokerage house's failure to live up to its agreement and its failure to timely liquidate McKeehan's account, as was its right, was the primary cause of most or all of McKeehan's loss. Having failed to live up to their word and having failed to diligently pursue their remedies, they should not now be permitted to recover. For these reasons I respectfully dissent.